**PARK SOUTH HOTEL CORP., Plaintiff,**

v.

**NEW YORK HOTEL TRADES COUNCIL AND HOTEL ASSOCIATION OF NEW YORK CITY, INC. PENSION FUND, Defendant.**

**Vito J. PITTA and Albert A. Formicola as Trustees of New York Hotel Trades Council and Hotel Association of New York City, Inc. Pension Fund, Additional Counter-claim Plaintiffs,**

v.

**PARK SOUTH ASSOCIATES, Formerly a New York Limited Partnership, Additional Counter-claim Defendant.**

**No. 82 Civ. 7554 (JES).**

United States District Court, S.D. New York.

Oct. 23, 1987.

Robinson, Silverman, Pearce, Aronsohn & Berman, New York City (Michael

O'Toole and Matthew Silverman, of counsel), for plaintiff.

Shea & Gould, New York City (Michael Lesch, of counsel), for defendant and additional counter-claim plaintiffs.

## OPINION AND ORDER

SPRIZZO, District Judge:

Plaintiff, Park South Hotel Corporation ("Park South Corporation"), brings this action seeking a judgment declaring that the withdrawal liability provisions of the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001 *et seq.* (1982), as amended by the Multiemployer Pension Plan Amendments Act of 1980 ("MPPAA" or "the Act"), 29 U.S.C. §§ 1381 *et seq.* (1982), are not applicable to the facts of this case. *See* Amended Complaint for Declaratory Relief ("Complaint") at ¶ 1.

The defendant is the New York Hotel Trades Council and Hotel Association of New York City Inc. Pension Fund ("the Fund"). The Fund is a multiemployer pension plan within the meaning of MPPAA. The Fund counterclaims seeking a judgment declaring that the plaintiff and Park South Associates, described in the counterclaim as a "former New York limited partnership," are jointly and severally liable to the Fund for withdrawal liability pursuant to MPPAA. *See* Answer to Amended Complaint and Counterclaims ("Answer") at ¶ 57 40. Vito J. Pitta and Albert A. Formicola, as trustees for the Fund (the "Trustees"), join the counterclaim as additional plaintiffs.[1]

The Court has held a hearing [2] and both parties have filed post-hearing briefs. For the reasons which follow, the Court denies plaintiff's request for a declaratory judgment and grants the request of defendant and the additional counterclaim plaintiffs for a declaratory judgment.

## I. BACKGROUND

The following facts are the sole facts which are material to this action. These facts are undisputed.

Until August 11, 1981, plaintiff Park South Corporation was the sole general partner of Park South Associates, a limited partnership organized under the laws of the State of New York. Park South Associates owned the Barbizon Plaza Hotel ("the Hotel").

Park South Associates was a member of the Hotel Association of New York City ("Hotel Association"), an employer bargaining association. Pursuant to a bargaining agreement between the Hotel Association and the New York Hotel Trades Council, AFL–CIO ("the Union"), Park South Associates was obliged to contribute to the defendant Fund on behalf of its employees at the Hotel.

On August 11, 1981, Park South Corporation and all of the limited partners in Park South Associates executed a Purchase Agreement selling 100% of the partnership interests in Park South Associates to Donald Trump. *See* Plaintiff's Exhibit ("PX") 8 at ¶ 3. It is this transaction and the circumstances surrounding this transaction which the Fund claims give rise to Park South Corporation's withdrawal liability. The details of this transaction are set forth below.

In addition to providing that Donald Trump would purchase 100% of the partnership interests, the Purchase Agreement provided that Trump "shall not be respon-

---

1. MPPAA provides that "[a] plan fiduciary, [or] employer ... who is adversely affected by the act or omission of any party under this subtitle with respect to a multiemployer plan ... may bring an action." *See* 29 U.S.C. § 1451(a)(1) (1982). Initially, the defendant argued that the Court lacked subject matter jurisdiction over this action because the plaintiff was not an employer and could not, therefore, maintain the action. However, the Trustees clearly may bring the counterclaim as plan fiduciaries. Thus, all parties and the Court now agree that the Court has subject matter jurisdiction over the counterclaim and, therefore, at a minimum, pendent jurisdiction over the plaintiff's claim.

2. The purposes of that hearing were to determine whether the plaintiff was an "employer" within the meaning of MPPAA and whether there were any issues of fact with respect to the merits of this action. Both of these issues had possible relevance to the question of whether the instant dispute must be arbitrated.

sible, as a consequence of the purchase intended hereby, for any obligation between or among the [former partners] or for *any obligation of the [former partners] or any of them to any third party.*" *See* PX 8 at ¶ 18 (BB)(v) (emphasis added). Moreover, just prior to the closing of the Purchase Agreement, the President of Park South Corporation and each of the former limited partners executed affidavits reaffirming that Mr. Trump would not be liable for any obligations of the selling partners to any third parties. *See* Defendant's Exhibit ("DX") J at ¶ 7(v); *see also* DX G.

These affidavits also warranted that Park South Associates is a "validly existing New York limited partnership, which has not been terminated by operation of law, *except as same may be terminated by virtue of said Assignment of Partnership Interests.*" *See* DX J at ¶ 3 (emphasis added). The affidavits also stated that they were executed "for the purpose and with the intent of inducing Donald J. Trump" to purchase the partnership interests. *See id.* at ¶ 14.

To effectuate the sale of the partnership interests to Donald Trump, the parties to the sale executed an Amended and Restated Certificate of Limited Partnership ("Amended Partnership Certificate"), *see* PX 9, and an Amended and Restated Partnership Agreement ("Amended Partnership Agreement"), *see* PX 10, for Park South Associates. Both of these documents provide that all of the former partners in Park South Associates (both general and limited) are withdrawing from the limited partnership. In addition, the documents provide that Donald Trump is admitted as the general partner and Donald Trump and Barbi-

zon Plaza Realty Corporation are admitted as limited partners.[3]

The sale of the partnership interests effectively transferred control over the Hotel from the previous general partner, Park South Corporation, to Donald Trump. Nonetheless, the formal ownership of the Hotel remained under the name of Park South Associates. According to the plaintiff, the transfer of the Hotel to Donald Trump was structured as a sale of the partnership interests rather than as an outright sale of the Hotel solely to avoid real estate transfer taxes and the possibility that a transfer of title would trigger an upward reassessment of the valuation of the Hotel for real estate tax purposes. *See* Transcript of Hearing ("Tr.") at 260–61; Plaintiff's Post–Trial Memorandum at 6.

For convenience, when referring solely to Park South Associates as it was constituted prior to the sale of the partnership interests, the Court will refer to the limited partnership as "Park South Associates I." Likewise, the Court will hereafter refer to the limited partnership after the sale as "Park South Associates II." Following the sale of the partnership interests, Park South Associates II agreed to recognize the Union as the collective bargaining agent of the Hotel employees, *see* DX N, and to continue to employ the Hotel employees.[4] In addition, Park South Associates II continued to contribute to the Fund on behalf of those employees.

As a consequence of the events described above, by letter dated December 1, 1981, the Fund demanded payments for withdrawal liability in the aggregate amount of $1,016,900 from Park South Corporation. By letter to the Fund dated February 5,

---

**3.** Donald Trump transferred a 1% limited partnership interest to Barbizon Plaza Realty Corporation.

**4.** This agreement between Park South Associates II and the Union was subsequently formally confirmed by an independent arbitrator's decision as follows:

> The new owners had, however, agreed to recognize the New York Hotel and Motel Trades Council as bargaining representative for the employees. It had also agreed to continue their seniority for purposes of layoffs,

vacations, personal days, bereavement leave, jury duty absence, sick days, leaves of absence, severance pay, and other conditions of employment that are non-economic in nature. The new owners also agreed to give the employees credit for previous service for severance pay computations.

> At the joint request of the parties, I am setting forth and confirming these arrangements between them. This obviates any action by me on the Union's grievance.

*See* DX N at 2.

1982, Park South Corporation disputed that demand, asserting that the "purchase of the partnership interests was not an event triggering withdrawal liability under [MPPAA]." DX H. In support of its claim that no withdrawal had occurred, the letter explained that:

The partnership interests in Park South Associates were purchased by Donald J. Trump on August 11, 1981. Prior thereto Park South Associates was the owner and operator of the Barbizon Plaza Hotel. It still is. Contributions continue to be made to the Pension Plan for the same employees pursuant to a collective bargaining agreement with the same union.

*Id.*

Beginning on or about April 2, 1982, the plaintiff began making quarterly payments of the demanded withdrawal liability to the Fund under protest and reserved the right to dispute the application of MPPAA's withdrawal liability provisions to the facts of this case.

## II. DISCUSSION

A multiemployer pension plan is a pension plan in which several employers in an industry pool their funds to provide pension protection for their employees. Prior to the enactment of MPPAA, employer withdrawals from those plans posed a significant threat to the stability of the plans. As explained to Congress by the Pension Benefits Guarantee Corporation ("PBGC"):[5]

A key problem of ongoing multiemployer pension plans, especially in declining industries, is the problem of employer withdrawal. Employer withdrawals reduce a plan's contribution base. This pushes the contribution rate for remaining employers to higher and higher levels in order to fund past service liabilities, including liabilities generated by employers no longer participating in the plan,

so-called inherited liabilities. The rising costs may encourage—or force—further withdrawals, thereby increasing the inherited liabilities to be funded by an ever-decreasing contribution base. This vicious downward spiral may continue until it is no longer reasonable or possible for the pension plan to continue.

*See Textile Workers Pension Fund v. Standard Dye & Finishing Co.,* 725 F.2d 843, 848 (2d Cir.1984) (quoting *Pension Plan Termination Insurance Issues: Hearing Before the Subcommittee on Oversight of the Committee on Ways and Means, House of Representatives,* 95th Cong., 2d Sess. 22 (1978)).

Congress responded to the problem of employer withdrawals by enacting MPPAA. *See generally Washington Star Co. v. International Typographical Union Negotiated Pension Plan,* 729 F.2d 1502, 1503–05 (D.C. Cir.1984); *Textile Workers Pension Fund v. Standard Dye & Finishing Co.,* 725 F.2d 843, 847–49 (2d Cir.1984); *Peick v. Pension Benefit Guaranty Corp.,* 539 F.Supp. 1025 (N.D.Ill. 1982), *aff'd,* 724 F.2d 1247 (7th Cir.1983), *cert. denied,* 467 U.S. 1259, 104 S.Ct. 3554, 82 L.Ed.2d 855 (1984).[6] Pursuant to MPPAA, if an employer withdraws from a multiemployer pension plan, that employer must pay certain sums to the plan to discharge its withdrawal liability. By requiring employers to pay these sums, Congress hoped to stem the "downward spiral" of continuing employer withdrawals. *See T.I.M.E.–DC, Inc. v. Management–Labor Welfare & Pension Funds, of Local 1730 Int'l Longshoremen's Assoc.,* 756 F.2d 939, 943–44 (2d Cir.1985).

Briefly, the sums arising with respect to an employer's withdrawal liability are computed as follows. An employer's withdrawal liability is equal to that employer's proportionate share of the plan's unfunded vested benefits. The unfunded vested benefits are calculated as the difference be-

---

5. The PBGC was created by Congress to oversee and provide insurance coverage to pension plans.

6. H.R.Rep. No. 869, 96th Cong., 2d Sess., pt. 1, at 67, *reprinted in* 1980 U.S. Code Cong. &

Admin. News 2918, 2935 ("[t]he purpose [of imposing withdrawal liability] is to relieve the funding burden on remaining employers and to eliminate the incentive to pull out of a plan").

tween the present value of vested benefits and the current value of the plan's assets. *See* 29 U.S.C. §§ 1381, 1391; *Pension Benefit Guaranty Corp. v. R.A. Gray & Co.,* 467 U.S. 717, 725, 104 S.Ct. 2709, 2715, 81 L.Ed.2d 601 (1984). The trustees of the plan have discretion to choose among various permissible actuarial methods in determining what a withdrawing employer's proportionate share of those unfunded vested benefits should be. *See Peick, supra,* 539 F.Supp. at 1034. For the purposes of this litigation, it is sufficient to note that an employer's past contribution history is taken into account in determining that proportionate share.[7]

Of course, an employer is not liable for withdrawal unless it withdraws from the Fund. Section 1383(a) of MPPAA defines a withdrawal as follows:

> A complete withdrawal from a multiemployer plan occurs when an employer—
>
> (1) permanently ceases to have an obligation under the plan, or
>
> (2) permanently ceases all covered operations under the plan.

29 U.S.C. § 1383(a).

There are narrow exceptions to the above-stated definition set forth in MPPAA. First, there is the so-called change in business form exception, which provides:

> Notwithstanding any other provision of this part, an employer shall not be considered to have withdrawn from a plan solely because—
>
> (1) an employer ceases to exist by reason of—

> (A) a change in corporate structure ..., or
>
> (B) a change to an unincorporated form of business enterprise,
>
> if the change causes no interruption in employer contributions or *obligations to contribute under the plan....*

*Id.* § 1398 (emphasis added). For the purposes of section 1398, a change in corporate structure includes a change in identity, form, or place of organization, or a merger, consolidation, or division. *See id.* §§ 1398, 1362(d)(1) & (3).

Second, MPPAA also provides that a bona fide arm's length sale of assets to an unrelated party will not be considered a withdrawal provided that the purchaser and seller strictly comply with conditions set forth in MPPAA. *See* 29 U.S.C. § 1384(a); *New York State Teamsters Conference Pension & Retirement Fund v. St. Lawrence Transit–Mix Corp.,* 612 F.Supp. 1003, 1009 (N.D.N.Y.1985). Specifically, for the sale of assets exception to apply, the purchaser must post a surety bond to insure payment of the full amount of withdrawal liability if and when the purchaser subsequently withdraws from the plan, the purchaser must have the same obligation to contribute to the plan as did the seller, and the seller must agree in the sale contract to remain secondarily liable for any withdrawal liability. *See* 29 U.S.C. § 1384(a)(1).

■ The issue presented by this action is whether Park South Associates I and Park South Corporation are jointly and severally responsible for the withdrawal liability imposed by MPPAA.[8] At the outset, the Court notes that if Park South Associates I

---

7. As the district court in *Peick* explained, with a caveat that the explanation was a "gross oversimplification":

> Under the "presumptive" method of section 1391(b), the liability is determined basically by multiplying the plan's aggregate unfunded vested liabilities by a fraction whose numerator is the sum of all contributions required to have been made by the withdrawing employer during the previous five years. The denominator is the sum of all contributions made by all employers during this same period.

*See Peick, supra,* 539 F.Supp. at 1034 & n. 11. All parties to this action agree that an employer's prior contribution history is taken into account in determining the amount of withdrawal

liability, if and when that employer withdraws from the plan.

8. This Court has entertained extensive arguments from the parties with respect to whether the instant dispute must be arbitrated pursuant to 29 U.S.C. § 1401(a). Although the plaintiff initially demanded arbitration, shortly thereafter the plaintiff switched its position and argued that arbitration was not required. The defendant then engaged in its own series of inconsistent arguments, at first vigorously arguing that arbitration was required and then just as vigorously maintaining that arbitration was unnecessary. The Court need not recount the long and protracted history of these disputes

is required to discharge its withdrawal liability to the Fund, then Park South Corporation, as the general partner, is of course liable for that debt as well. *See* N.Y. Partnership Law §§ 26, 98(1) (McKinney 1987). For the reasons set forth below, the Court concludes that Park South Associates I is subject to the withdrawal liability imposed by MPPAA.

The plaintiff argues that Park South Associates I is not liable for withdrawal liability because it did not withdraw from the Fund within the meaning of § 1383(a). Significantly, the plaintiff does not rely on either the change of form or the sale of assets exception, and indeed, specifically concedes that Park South Associates I cannot find a safe harbor in any exception set forth in MPPAA. *See* Post–Trial Memorandum of Plaintiff Park South Hotel Corp. ("Plaintiff's Memorandum") at 30.[9] Instead, the plaintiff argues Park South Associates I never withdrew because Park South Associates II is the same employer as Park South Associates I and has continued to employ the same employees and to contribute to the Fund on their behalf.

---

because, notwithstanding their earlier inconsistent positions, both parties now agree that arbitration is not required.

The Court agrees with the parties' present position. It is well-settled that litigants need not resort to arbitration in an action brought pursuant to MPPAA if the resolution of the dispute turns solely on a question of statutory interpretation. *See T.I.M.E.–DC, Inc., supra,* 756 F.2d at 945; *I.A.M. Nat'l Pension Fund Benefit Plan C v. Stockton TRI Indus.,* 727 F.2d 1204, 1210 (D.C. Cir.1984). This action falls squarely within that exception because the material facts, *i.e.,* that there was a sale of 100% of the partnership interests and that Mr. Trump did not assume any liabilities of the old partners, are undisputed.

Moreover, § 1401(a) only requires arbitration of factual disputes between an "employer" and the Fund. *See Banner Indus., Inc. v. Central States, Southeast and Southwest Areas Pension Fund,* 657 F.Supp. 875, 880 (N.D.Ill.1987); *Refined Sugars, Inc. v. Local 807 Labor–Management Pension Fund,* 580 F.Supp. 1457, 1461–62 (S.D.N.Y.1984); *Baldwin v. Shopmen's Ironworkers Pension Trust,* 3 Employee Benefits Cas. (BNA) 1713, 1716 (C.D.Cal.1982). There is some question as to whether the plaintiff is an employer within the meaning of the statute and, as noted in note 2, *supra,* the Court held a hearing to resolve that question. At that hearing, all parties presently in the action agreed that the plaintiff was not the employer. *See* Tr. at 5. However, in its reply memorandum, the defendant has apparently altered its position and appears to be again claiming that the plaintiff is the employer. *See* Defendant's Post–Trial Reply Memorandum at 6. This ambiguity with respect to plaintiff's status as an employer affords further support for the non-arbitrability of the issues raised by this action. However, there is no need for the Court to definitively resolve the issue of plaintiff's employer status, since, as noted above, the issue of whether plaintiff is subject to withdrawal liability is one solely of statutory interpretation with respect to concededly undisputed material facts.

9. Specifically, the plaintiff asserts that it cannot take advantage of 29 U.S.C. § 1398, the change in form exception, because "[o]f course, in the instant case there is not a change in structure." *See* Plaintiff's Memorandum at 30.

The plaintiff does not and cannot argue that the transfer of 100% of the partnership interests is covered by § 1398(1)(B), which excepts from the definition of a withdrawal "a change to an unincorporated form of business enterprise." The clear implication of this exception is that the exception only applies when a corporation changes to an unincorporated association. Since the partnership was concededly never incorporated in the first place, § 1398(1)(B) does not apply.

Although neither party has cited the case, the Court notes that at least one district court has interpreted § 1398(1)(B) to apply to a factual situation in which one partner in a two-party partnership is replaced with another partner. *See Connors v. B & W Coal Co.,* 646 F.Supp. 164 (D.D.C.1986). This case, which apparently interprets "a change *to* an unincorporated association" to include a change *in* an unincorporated association, appears to be at odds with the plain language of the statute.

In any event, the *Connors* case is clearly distinguishable from the instant action. Section 1398(1)(B) will only apply if the new partnership not only continues contributing to the Fund, but also assumes the old partnership's obligation to contribute. *See* 29 U.S.C. § 1398. In *Connors,* the agreement transferring the partnership interests "clearly transferred ... all of the benefits and obligations of the predecessor" partnership. *See Connors, supra,* 646 F.Supp. at 169. In the instant case, however, the purchase agreement did not transfer any obligations of Park South Associates I to the partners of Park South Associates II and, indeed, the agreement specifically provided that Trump would not assume any liabilities of the old partners. In view of that circumstance, even assuming *arguendo* that § 1398(1)(B) could apply to a 100% change in a partnership's membership, that section would still be inapplicable. *Compare Dorn's Transportation, Inc. v. Teamsters Pension Trust Fund,* 787 F.2d 897, 901 (3d Cir.1986).

The defendant, on the other hand, argues that Park South Associates I and Park South Associates II cannot be considered the same employer for the purpose of determining whether a withdrawal has occurred. According to the defendant, Park South Associates I permanently ceased covered operations and permanently ceased to have an obligation to contribute to the Fund following the transfer of the partnership interests.[10]

The Court agrees with the defendant. It would exalt form over substance, and would clearly be inconsistent with the broad remedial purposes of MPPAA, to find no change in employer status where, as here, there are no common partners between the two partnerships, where the new partners have expressly disavowed any obligations of the old partners, and, indeed, where the only thing the two partnerships have in common is the partnership name. It simply defies common sense to say that Park South Associates II, a partnership made up of Donald Trump and the Barbizon Plaza Realty Corporation, is the same employer as Park South Associates I, a partnership made up of Park South Corporation and several independent limited partners.

While it is true that Park South Associates II subsequently agreed to employ the Hotel employees and to contribute to the Fund on their behalf, MPPAA is concerned with much more than merely insuring continuing present contributions for one employer's employees. *See Central States Southeast and Southwest Areas Pension Fund v. Bellmont Trucking*, 788 F.2d 428, 432 (7th Cir.1986). Rather, the withdrawal liability provisions of MPPAA seek to protect the stability of the plan and the vested interests of *all* participating employees by requiring an employer to pay, upon withdrawal, its proportionate share of the unfunded vested benefits.

In the instant case, according to the unambiguous terms of the purchase agreement, the purchasing partners did not assume any of the selling partner's liabilities, including their liability for the former partnership's contribution history up to that point. As a consequence, when and if Park South Associates II withdraws from the Fund at a later time, Park South Associates II's withdrawal liability will not be calculated with reference to the old partnership's contribution history. Thus, if withdrawal liability is not imposed upon Park South Associates I at this time, the burden of funding Park South Associates I's proportionate share of the unfunded liabilities will fall on the remaining contributing employers in the Fund. As noted by the PBGC in an opinion letter dealing with a similar factual scenerio, "[t]his is precisely the result Congress sought to avoid with the passage of the Multiemployer Act." *See* PBGC Opinion Letter 82–040 at 2 (December 27, 1982) (annexed as exhibit 2 to Defendant's and Additional Counterclaim Plaintiffs' Post–Trial Memorandum).[11]

---

**10.** The defendant also argues that a letter sent by the plaintiff to the Union just prior to the closing of the Purchase Agreement, which purported to discharge all of the Hotel employees, *see* DX B, in and of itself establishes a withdrawal. The Court does not agree. While that letter may be relevant to the issue of whether there has been a *permanent* cessation of covered operations as the statute requires, it is not and cannot be dispositive, especially where, as here, no employees actually left their jobs, and there was no de facto interruption of their employment activity.

**11.** In that opinion letter, the PBGC counsel considered the question of whether a selling employer is shielded from withdrawal liability when it sells its assets to a purchaser who takes over the seller's name, plant, employees, and inventory. It was conceded, as in the instant case, that none of the requirements set forth in the sale of assets exception were met. The PBGC counsel concluded that withdrawal liability would be imposed on the selling employer in that case. According to the opinion letter:

In this situation, Congress intended the seller to pay his allocated share of the plan's unfunded vested benefits, i.e., that share which was accrued during his participation in the plan. The purchaser has no obligation for this past liability and is treated as a new employer contributing to the plan with respect to the transferred operations. Thus, unless the seller is considered to have withdrawn from the plan, the seller's share of the plan's unfunded vested benefits would fall on the remainder of the contributing employers. This is precisely the result Congress sought to avoid with the passage of the Multiemployer Act.

Moreover, if the plaintiff were to succeed in its characterization of Park South Associates II as the same employer as Park South Associates I, then any partnership wishing to sell its assets could easily avoid the stringent requirements set forth in the sale of assets exception by simply transferring the partnership interests rather than selling its assets outright. As noted above, for the sale of assets exception to apply, the purchaser must post a surety bond to insure payment of the full amount of withdrawal liability if and when the purchaser subsequently withdraws from the plan, the purchaser must have the same obligation to contribute to the plan as did the seller, and the seller must agree in the sale contract to remain secondarily liable for any withdrawal liability. *See* 29 U.S.C. § 1384(a)(1); *cf. New York State Teamsters, supra,* 612 F.Supp. at 1009. Concededly, none of these requirements were met in this case. Indeed, rather than posting a bond to insure that the full amount of withdrawal liability would be paid if and when Park South Associates II withdrew from the Fund, Mr. Trump specifically declined to assume any liabilities of the partners in Park South Associates I, thereby insuring that the full amount of withdrawal liability would *not* be paid following a subsequent withdrawal. Because the Court cannot ascribe to Congress the intent to permit the statutory requirements in the sale of assets exception to be so easily circumvented, the Court must conclude that Park South Associates I withdrew from the Fund.

Indeed, the plaintiff concedes that even though Park South Associates II has continued to contribute to the Fund, if Park South Associates II is not liable for the former partnership's contribution history, then withdrawal liability must be imposed or the "purpose of the statute would be defeated." *See* Plaintiff's Reply Memorandum at 4. However, the plaintiff argues that under New York partnership law, Park South Associates II is the same partnership as Park South Associates I because

the parties to the sale of the partnership interests specifically agreed to continue the partnership, and that therefore, Park South Associates II will be liable for Park South Associates I's debts, including its contribution history, regardless of any specific agreement to the contrary in the purchase agreement. Thus, plaintiff concludes that the facts of this case are analogous to the corporate merger and sale of assets exceptions and, therefore, no withdrawal liability should be found. *See* Plaintiff's Memorandum at 30–31. These arguments lack merit and must be rejected.

First, the Court notes that the issue of whether there has been a withdrawal under MPPAA is a federal question that cannot be determined by reference to the differing partnership laws of the states. In enacting MPPAA, Congress set up a comprehensive and detailed scheme to deal with a perceived problem which was national in scope. Therefore, Congress could not have intended that the question of whether withdrawal liability has been incurred should turn on state law. Instead, the Court must look to federal law and the federal policy considerations underlying MPPAA to resolve that issue. *Cf. Refined Sugars, Inc. v. Local 807 Labor–Management Pension Fund,* 632 F.Supp. 630, 633 (S.D.N.Y.1986).

A proper analysis of these considerations leads inevitably to the conclusion that, even assuming *arguendo* that Park South Associates II is liable for Park South Associates I's debts under New York law, the Court must still find withdrawal liability. Congress enacted a carefully drawn and reasonably restrictive scheme of situations in which withdrawal liability could be avoided. In the sale of assets exception, Congress specifically required the purchasing company to post a surety bond. In the change in form exception, Congress required that the resulting entity specifically assume the old corporation's obligation to contribute to the Fund. Congress could have created a further exception to withdrawal liability where

*See* PBGC Opinion letter 82–040 at 2 (December 27, 1982). The facts of this action are even more compelling with respect to the imposition of withdrawal liability than those set forth in

the opinion letter because here the purchasing partner *specifically* declined to assume any of the selling partners' liabilities.

liability for the former employer's contribution history is imposed as a matter of state law, but chose not to do. In the face of that statutory scheme, the Court is not free to judicially create a new exception to the scheme arising out of the fortuitous circumstance that the laws of one state, on the unique facts of this action, may impose upon the new employer a liability for the old employer's contribution history. This is especially true since Congress expressly provided exceptions for a corporate merger and for a sale of assets but did not provide an exception for a transfer of 100% of a partnership's interests. *See Central States, supra,* 788 F.2d at 433.

Moreover, the Court is not convinced that a New York court would, as plaintiff argues, consider Park South Associates II to be the same partnership as Park South Associates I and, therefore, hold Park South Associates II liable for the contribution history of Park South Associates I. The plaintiff has not cited any New York statute or case law supporting the highly questionable proposition that a limited partnership does not dissolve, where, as here, all of the general and limited partners simultaneously withdraw from the partnership and the new partners and old partners expressly agree that the new partners will not be liable for any of the old partners' debts. To the contrary, the general rule is that the withdrawal of a single general partner causes a dissolution of the partnership. *See* N.Y. Partnership Law §§ 60, 98 (McKinney 1987); *Vann v. Kreindler, Relkin & Goldberg,* 78 A.D.2d 255, 258, 434 N.Y.S.2d 365, 368 (1st Dept. 1980), *aff'd,* 54 N.Y.2d 936, 429 N.E.2d 817, 445 N.Y.S.2d

139 (1981); *C.E. Hooper, Inc. v. Perlburg, Monness, Williams & Sidel,* 72 A.D.2d 687, 688, 421 N.Y.S.2d 353, 354 (1st Dept. 1979), *appeal dismissed,* 49 N.Y.2d 736, 402 N.E.2d 1169, 426 N.Y.S.2d 268 (1980).[12]

Moreover, the factual underpinnings of plaintiff's argument, *i.e.,* that the purchasing and selling partners specifically agreed that the partnership would continue, is dubious at best. Plaintiff has not come forward with any such specific agreement to continue the partnership but instead relies merely on the fact that the purchasing and selling partners characterized the new partnership agreement and certificate for Park South Associates II as "Amended." *See* PX 9; PX 10. While that characterization might arguably permit an inference that the parties intended to continue the partnership, it does not rise to the level of establishing the specific agreement to continue the partnership which plaintiff claims exists. Given the clear and unambiguous terms of both the Purchase Agreement and the selling partners' affidavits, which expressly stated that the purchasing partners were not liable for any debts of the withdrawing partners, and the fact that the partnership continued in name only, it is difficult to believe that a New York court would shift to Park South Associates II the burden of assuming the old partnership's debts, merely because, as a matter of form the parties to the sale executed an Amended Partnership Certificate and an Amended Partnership Agreement rather than formally executing a new partnership certificate and agreement for Park South Associates II.[13]

---

**12.** Section 109 of the New York Partnership Law, relied upon heavily by the plaintiff, is not applicable to this case. This section provides:

> The retirement, death or insanity of a general partner dissolves the partnership, unless the business is continued by the *remaining* general partners
> (a) under a right to do so stated in the certificate, or,
> (b) with the consent of all members.

N.Y. Partnership Law § 109 (McKinney 1987) (emphasis added).

Here the business was not continued by the remaining general partners for the simple reason that there were no "remaining" general

partners following the sale of 100% of the partnership interests.

**13.** The plaintiff also argues that because the parties to the sale structured the deal as a transfer of the partnership interests rather than as a sale of assets, concededly solely for the purposes of avoiding real estate taxes, those parties specifically intended that the partnership would be the same entity. This intent that plaintiff attributes to the parties, however, is belied by the selling partners' affidavits executed at the time of the sale. These affidavits indicate that the parties were in no way concerned with whether the two partnerships were considered the same entity, and indeed, anticipated that

## III. CONCLUSION

For all of the aforementioned reasons, plaintiff's request for a declaratory judgment is denied. The request of defendant and the additional plaintiffs on the counterclaim for a declaratory judgment is granted as follows:

Park South Corporation and Park South Associates I are jointly and severally liable to the Fund for withdrawal liability pursuant to 29 U.S.C. § 1381.

Judgment shall be entered accordingly.

It is SO ORDERED.

Park South Associates I might dissolve as a result of the sale. Instead, as those affidavits indicate, the parties were only concerned that the new partners would not be liable for any of the old partners' liabilities, an intent which the plaintiff now seeks to frustrate. Moreover, the selling partners' affidavits stated that Park South Associates I is a "wholly existing New York limited partnership which has not been terminated by operation of law, except as same may be terminated by virtue of said Assignment of Partnership Interests." This constitutes further evidence that the parties, rather than specifically intending the partnership to continue,

contemplated that the sale of the partnership interest would and could effect the termination of the partnership. See DX J at ¶ 3; see also DX G.