**PARK SOUTH HOTEL CORPORATION, Plaintiff–Appellant,**

v.

**NEW YORK HOTEL TRADES COUNCIL and Hotel Association of New York City, Inc., Pension Fund, Defendant–Appellee.**

No. 947, Docket 87–9025.

United States Court of Appeals, Second Circuit.

Argued March 28, 1988.

Decided June 29, 1988.

Andrew Irving, New York City (Robinson, Silverman, Pearce, Aronsohn & Berman, New York City), for plaintiff-appellant.

Michael Lesch, New York City (Christopher J. Sues, Clifford L. Davis, Shea & Gould, New York City), for defendant-appellee.

Before FEINBERG, Chief Judge, KEARSE and FRIEDMAN,* Circuit Judges.

FRIEDMAN, Circuit Judge:

This is an appeal from a declaratory judgment of the United States District Court for the Southern District of New York that the appellant Park South Hotel Corporation and Park South Associates are jointly and severally liable for withdrawal liability payments under the Multiemployer Pension Plan Amendments Act of 1980 (MP–PAA), 29 U.S.C. § 1381 *et seq.* (1982). *Park South Hotel Corp. v. New York Hotel Trades Council and Hotel Ass'n of New York City, Inc., Pension Fund,* 671 F.Supp. 1000 (S.D.N.Y.1987). We reverse.

I

A. We recently summarized the background and pertinent provisions of MPPAA in *ILGWU National Retirement Fund v. Levy Bros. Frocks, Inc.,* 846 F.2d 879, 880–81 (2d Cir.1988):

* Daniel M. Friedman, Judge of the United States Court of Appeals for the Federal Circuit, sitting by designation.

MPPAA was enacted by Congress in September 1980 for "[t]he primary purpose of ... protect[ing] retirees and workers who are participants in [multiemployer] plans against the loss of their pensions." In particular, Congress was concerned that as of 1980:

(1) the magnitude of the risk and the potential exposure of the [multiemployer plan] system are intolerably high; and (2) existing law and particularly the plan termination insurance provisions are inadequate to assure financially sound multiemployer plans, may accelerate declines and further weaken and hasten the termination of financially weak plans.... [T]here are serious defects in current law which undermine the benefit security of multiemployer plan participants.

Thus, in *T.I.M.E.–DC, Inc. v. Management–Labor Welfare & Pension Funds,* 756 F.2d 939, 943 (2d Cir.1985), we pointed out that "[t]he policy of the MPPAA ... was to protect the interests of participants and beneficiaries in financially distressed multiemployer plans and to encourage the growth and maintenance of multiemployer plans."

Under MPPAA an employer who withdraws from a multiemployer plan, with certain exceptions, is assessed "withdrawal liability," that is, the employer is required to continue funding its proportionate share of the plan's unfunded vested benefits. 29 U.S.C. §§ 1381, 1391. The purpose of withdrawal liability "is to relieve the funding burden on remaining employers and to eliminate the incentive to pull out of a plan which would result if liability were imposed only on a mass withdrawal by all employers." ....

When an employer withdraws from a multiemployer plan, the plan sponsor, that is, the entity maintaining the plan, must determine the amount of the employer's withdrawal liability, notify the employer of the amount and make a demand for payment. [Citations omitted.]

An employer's withdrawal liability is equal to the employer's proportionate share of the plan's unfunded vested employee benefits. The unfunded vested benefits are calculated as the difference between the present value of vested benefits and the current value of the pension plan's assets. *See* 29 U.S.C. §§ 1381, 1391 (1982); *Pension Benefit Guaranty Corp. v. R.A. Gray & Co.,* 467 U.S. 717, 725, 104 S.Ct. 2709, 2715, 81 L.Ed.2d 601 (1984). An employer's past contribution history is considered in determining its proportionate share of unfunded benefits. *Park South Hotel Corp.,* 671 F.Supp. at 1004.

B. The facts in this case are undisputed. The appellant, Park South Hotel Corporation (Park South), was the sole general partner of Park South Associates (the partnership), a limited partnership organized under the laws of New York. The partnership owned the Barbizon Plaza Hotel (Hotel). The partnership was a member of a multiemployer bargaining unit, the Hotel Association of New York City (Hotel Association). Pursuant to a collective bargaining agreement between the Hotel Association and the union, the partnership was required to contribute to the appellee New York Hotel Trades Council and Hotel Association of New York City, Inc., Pension Fund (the Fund). The Fund is a multiemployer pension plan under MPPAA.

The Hotel Association and the union regarded the partnership as the employer. The union directed complaints filed against the management of the Hotel to the partnership. The general partner, Park South, never was a member of the Hotel Association employers' bargaining unit. The member was the partnership in its trade name, Barbizon Plaza Hotel.

In August 1981, Park South and all the limited partners sold their partnership interests to Donald Trump. Trump became the new general partner, and Barbizon Plaza Realty Corporation and Trump became the new limited partners. To effectuate the sale of the partnership interests, the parties executed an Amended and Restated Certificate of Limited Partnership, and an Amended Partnership Agreement, for Park South Associates, which recited that the old partners will have withdrawn from, and that Trump and Barbizon Plaza Realty

would be "admitted" as partners of Park South Associates. The amended Partnership Agreement and Certificate recognized that the partnership would continue.

The purchase agreement provided that Trump "shall not be responsible, as a consequence of the purchase intended hereby, for any obligation between or among the Sellers or for any obligation of the Sellers or any of them to any third party."

The sale of the partnership interests transferred control and management of the Hotel from the former general partner, Park South Corporation, to the new general partner, Donald Trump. The partnership, Park South Associates, continued to own the Hotel.

The transaction was structured as a sale of the partnership interests rather than as a direct sale of the Hotel because a direct sale would have resulted in substantial real estate transfer taxes and an increase in real property taxes.

After the sale, the partnership, through its new partners, agreed to recognize the union as the collective bargaining agent of the Hotel employees. The partnership continued its payments to the Fund.

Although following the sale Park South wrote a letter to the union purporting to dismiss all the Hotel's employees, the new management retained all the Hotel's employees. The district court noted that following the sale, the partnership "agreed to recognize the Union as the collective bargaining agent of the Hotel employees" and "agreed to continue [the employees'] seniority for purposes of lay-offs, vacations, personal days, bereavement leave, jury duty absence, sick days, leaves of absences, severance pay, and other conditions of employment that are non-economic in nature." 671 F.Supp. at 1002, and n. 4.

Approximately four months after the sale, the Fund demanded payment from Park South for withdrawal liability of approximately $1 million. Park South denied liability. It argued that prior to the sale of the partnership interests, "Park South Associates was the owner and operator of the Barbizon Plaza Hotel. It still is. Contributions continue to be made to the Pension Plan for the same employees pursuant to a collective bargaining agreement with the same union." *Park South Hotel Corp.,* 671 F.Supp. at 1003. In April 1982, Park South began making quarterly payments to the Fund under protest and reserved the right to dispute its withdrawal liability.

C. Park South then filed the present suit against the Fund, seeking a declaratory judgment that it had not incurred withdrawal liability under MPPAA by reason of the sale of the partnership interest because that sale did not constitute a "withdrawal" under the Act. The Fund counterclaimed for a declaratory judgment that Park South and Park South Associates (which it described as a "former New York limited partnership") were jointly and severally liable to the Fund for withdrawal liability. After an evidentiary hearing, the district court held for the Fund and granted the following declaratory judgment:

> Park South Corporation and Park South Associates I are jointly and severally liable to the Fund for withdrawal liability pursuant to 29 U.S.C. § 1381.

*Id.* at 1009.

The court held, as the parties agreed, that the dispute was not required to be arbitrated. 671 F.Supp. at 1005 n. 8. See part II below. The court ruled that Park South Associates had withdrawn from the Fund when the partners sold their interests to Trump. The court agreed with the Fund that Park South Associates "permanently ceased covered operations and permanently ceased to have an obligation to contribute to the Fund following the transfer of the partnership interests." *Id.* at 1006 (footnote omitted). The court stated:

> It would exalt form over substance, and would clearly be inconsistent with the broad remedial purposes of MPPAA, to find no change in employer status where, as here, there are no common partners between the two partnerships, where the new partners have expressly disavowed any obligations of the old partners, and, indeed, where the only thing the two partnerships have in common is the partnership name. It simply defies common sense to say that Park South Associates

II, a partnership made up of Donald Trump and the Barbizon Plaza Realty Corporation, is the same employer as Park South Associates I, a partnership made up of Park South Corporation and several independent limited partners.

*Id.*

## II

[3] The Act provides that "[a]ny dispute between an employer and the plan sponsor of a multiemployer plan concerning a determination made under," among other provisions, the provision (29 U.S.C. § 1381 (1982)) governing employer withdrawal from such a plan, "shall be resolved through arbitration." 29 U.S.C. § 1401(a) (1982). Despite the breadth of this language, we have recognized that not every dispute over withdrawal liability necessarily must be arbitrated. *T.I.M.E.–DC v. Management–Labor Welfare & Pension Funds,* 756 F.2d 939 (2d Cir.1985).

■ In the present case, both parties concluded that arbitration was not required. The district court agreed on the ground that the resolution of the dispute turned solely on a question of statutory interpretation. 671 F.Supp. at 1005 n. 8. Although neither party has appealed that ruling, we address the issue briefly, lest our decision be read as adopting the district court's rationale on this point.

In *T.I.M.E.–DC*, we held that "the arbitration provisions of MPPAA do not constitute an absolute bar to federal jurisdiction but instead constitute an exhaustion of administrative remedies requirement." *ILG-WU Fund,* 846 F.2d at 887. In the present case, we conclude that exhaustion of the arbitration remedy is not required because (1) this case presents no factual issues but only legal questions of statutory interpretation, (2) the parties agreed that arbitration was not required, (3) the suit was filed before the time for invoking arbitration had expired, and (4) judicial economy would not be served by remanding the case at this late stage for arbitration, which almost certainly would be followed by further judicial proceedings. We intimate no view on whether arbitration would be required in a case in which all of these factors were not present, or which involved some of these, and also other factors. *Cf. ILGWU Fund* (arbitration required).

## III

■ MPPAA imposes withdrawal liability "[i]f an employer withdraws from a multiemployer plan in a complete withdrawal...." 29 U.S.C. § 1381(a) (1982). The Act further provides that

a complete withdrawal from a multiemployer plan occurs when an employer—

(1) permanently ceases to have an obligation to contribute under the plan, or

(2) permanently ceases all covered operations under the plan.

29 U.S.C. 1383(a) (1982).

We conclude that under this statutory text no withdrawal from the Plan occurred when the partners of Park South Associates sold their partnership interests to Trump.

A. At all pertinent times, both before and after the sale, it was the partnership, not Park South Hotel Corporation (the general partner before the sale), that was the "employer." Before the sale it was the partnership that made the payments to the Fund, and the partnership continued to make those payments after the sale. At all times before and after the sale, the partnership owned and held title to the Hotel. The partnership continued its existing relationship with the union and with its employees, who continued to work for it, on the same terms and conditions, after the sale. Despite the changes in its membership, the partnership continued to function the same way it had functioned before the sale.

While technically a partnership is dissolved under New York law any time a partner ceases to be "associated in the carrying on as distinguished from the winding up of the business," N.Y. Partnership L. § 60 (McKinney 1948), dissolution does not "terminate[]" the partnership in the absence of a winding up of the partnership affairs, *id.* § 61. Where, as here, the new partners evince an intention to continue the partnership business, there has been no

termination and the new partners may be held to be bound by the obligations of the old. *See Newburger, Loeb & Co. v. Gross,* 611 F.2d 423 (2d Cir.1979); *Vann v. Kreindler, Relkin & Goldberg,* 54 N.Y.2d 936, 445 N.Y.S.2d 139, 429 N.E.2d 817 (1981); *Gelder Medical Group v. Webber,* 41 N.Y. 2d 680, 394 N.Y.S.2d 867, 363 N.E.2d 573 (1977); *Lanier v. Bowdoin,* 282 N.Y. 32, 24 N.E.2d 732 (1939); *Levy v. Leavitt,* 257 N.Y. 461, 178 N.E. 758 (1931).

In sum, the partnership continued its "obligation to contribute under the plan," and it continued "all covered operations under the plan." The sale of the partnership interest was not "a complete withdrawal [by the partnership] from a multiemployer plan" under 29 U.S.C. § 1383.

■ B. The district court gave considerable weight, as does the Fund here, to the fact that the sales agreement provided that Trump would not be liable for any obligation of the sellers to any third party. The court stated:

> In the instant case, according to the unambiguous terms of the purchase agreement, the purchasing partners did not assume any of the selling partner's liabilities, including their liability for the former partnership's contribution history up to that point. As a consequence, when and if Park South Associates II withdraws from the Fund at a later time, Park South Associates II's withdrawal liability will not be calculated with reference to the old partnership's contribution history. Thus, if withdrawal liability is not imposed upon Park South Associates I at this time, the burden of funding Park South Associates I's proportionate share of the unfunded liabilities will fall on the remaining contributing employers in the Fund.

671 F.Supp. at 1006.

The determination whether the sale of the partnership interests constituted a "withdrawal" of the "employer" (the partnership) from the plan is governed by the federal Act. The parties' agreement that Trump would not be liable for any debts of the selling partners to third persons does not affect the liability of the partnership to the Fund, which federal law created and the determination of which federal law governs. The parties cannot by agreement change or eliminate any liability that federal law imposes upon the partnership.

If at some future time the Fund attempts to impose withdrawal liability upon the partnership, and Trump as the general partner is required to pay that liability, he may have a claim against the selling partners. The allocation of liability between the old and new partners for the partnership's withdrawal obligation for the period prior to the sale is a matter between Trump and the old partners. It does not affect the question whether under MPPAA the sale of the partners' interests constituted a withdrawal from the plan by the partnership.

C. Our conclusion that no employer withdrawal occurred in this case is further supported by 29 U.S.C. § 1398 (1982), which states:

> Notwithstanding any other provision of this part, an employer shall not be considered to have withdrawn from a plan solely because—
>
> (1) an employer ceases to exist by reason of—
>
> (A) a change in corporate structure described in section 1362(d) of this title [change of identity, form, or place, and corporate reorganizations], or
>
> (B) a change to an unincorporated form of business enterprise,
>
> if the change causes no interruptions in employer contributions or obligations to contribute under the plan....
>
> For purposes of this part, a successor or parent corporation or other entity resulting from any such change shall be considered the original employer.

This provision does not directly cover the present case because it deals only with changes in corporate structure. It shows, however, that Congress did not intend to treat, as an employer withdrawal from a plan, mere changes in the form or structure of an employer that do not alter the employer's basic relation with, participation in, or obligation to, the plan or change the

nature of the employer's operations. As the House Report on the bill stated, a

> withdrawal would not occur, however, where an employer ceases to exist by reason of a change in form or structure, as long as the employer is replaced by a successor employer and there is no interruption in the employer's contributions to the plan or the employer's obligations under the plan.

H.R.Rep. No. 869, pt. 1, at 73–74, *reprinted in* 1980 U.S.Code & Admin.News 2918, 2942. *See also,* H.R.Rep. No. 869, pt. 2, at 16, *reprinted in* 1980 U.S.Code & Admin.News at 3005–06 (and example provided).

If the employer in this case had been a corporation and the parties had accomplished a similar change in ownership, section 1398 indicates that there would have been no withdrawal. It is unlikely that Congress intended a different result when a similar structural change occurred, merely because the employer was a partnership rather than a corporation. To the contrary, the change in ownership of the partnership interests in this case had the same effect as the change in corporate structure that Congress stated in section 1398 would not constitute a withdrawal, namely one that causes "no interruptions in employer contributions or obligations to contribute under the plan."

The Fund has not explained how imposing withdrawal liability upon the partnership in this case is necessary to, or even would further, the congressional purpose underlying MPPAA "to relieve the funding burden on remaining employers and to eliminate the incentive to pull out of a plan...." H.R.Rep. No. 869, 96th Cong., 2d Sess., pt. 1, at 67, *reprinted in* 1980 U.S.Code Cong. & Admin.News at 2935. As we have shown, the partnership continued to remain liable to the Fund and has continued to make payments to the Fund despite the change in the ownership of the partnership interests. In these circumstances the sale of the partnership interests did not create the problems for the Fund that Congress sought to ameliorate by imposing withdrawal liability.

## CONCLUSION

The declaratory judgment of the district court that Park South Hotel Corporation and Park South Associates are jointly and severally liable to the Fund for withdrawal liability is reversed, and the case is remanded to that court for entry of a declaratory judgment that they are not liable to the Fund for withdrawal liability.