CARRIERS CONTAINER COUNCIL, INC., Plaintiff–Appellant, Cross Appellee,

v.

MOBILE STEAMSHIP ASSOC. INC.—INTERNATIONAL LONGSHOREMAN'S ASSOC., AFL–CIO PENSION PLAN AND TRUST, and its trustees F.D. Alspaugh, Arthur W. Stratton, Hartwell Ludlow, Ned Mattingly, Felix Cleveland, Henry L. Clarke, Albert Walton, Jr., Seymour Irby, Defendants–Appellees, Cross Appellants.

CARRIERS CONTAINER COUNCIL, INC., Plaintiff–Appellee,

v.

MOBILE STEAMSHIP ASSOCIATION, INC., International Longshoreman's Assoc. AFL–CIO Pension Plan and Trust and its trustees, F.D. Alspaugh, Arthur W. Stratton, Hartwell Ludlow, Ned Mattingly, Felix Cleveland, et al., Defendants–Appellants.

MOBILE STEAMSHIP ASSOCIATION, MSSA–ILA Pension Plan & Welfare Plans, MSSA–ILA Local 1985 Maintenance Employees' Pension Plan, PMTA–ILA Pension Fund, PMTA–ILA Welfare Fund, PMTA–ILA Supplemental Unemployment Compensation Benefit Plan, et al., Plaintiffs–Appellees,

v.

CARRIER'S CONTAINER COUNCIL, INC., Defendant–Appellant,

International Longshoreman's Association, AFL–CIO, Intervenor–Defendant.

Nos. 89–7279, 89–7451 and 89–7505.

United States Court of Appeals, Eleventh Circuit.

March 22, 1990.

Wesley Pipes, Lyons, Pipes & Cook, P.C., Mobile, Ala., Peter C. Lambos, Constantine P. Lambos, Conato Caruso, Lambos & Giardino, New York City, for Carriers Container Council, Inc.

William B. Harvey, Armbrecht, Jackson, DeMouy, Crowe, Holmes & Reeves, Edward A Dean, Mobile, Ala., Michael A. Figures, Figures, Jackson & Harris, Mobile, Ala., Paul D. Mysick, Frank McRight, McRight, Jackson, Myrick & Moore, Mobile, Ala., for Mobile S.S. Ass'n, et al.

Gardner, Middlebrooks & Fleming, P.C., J. Cecil Gardner, Mobile, Ala., for ILA Local 1985, et al.

Armbrecht, Jackson, DeMouy, Crowe, Holmes & Reeves, William B. Harvey, Edward A. Dean, Mobile, Ala., for MSSA–ILA Pension Plan, et al.

Scanlan & Scanlan, P.C., Francis A. Scanlan, Philadelphia, Pa., Freedman & Lorry, P.C., Stanley B. Gruber, Philadelphia, Pa., for trustees of the PMTA–ILA Pension Fund, et al.

Ernest L. Mathews, New York City, for ILA, AFL–CIO, amicus curiae.

Before KRAVITCH and JOHNSON, Circuit Judges, and TUTTLE, Senior Circuit Judge.

JOHNSON, Circuit Judge:

These cases are consolidated for appeal after the district court's denial of summary judgment to Carriers Container Council ("CCC") and grant of summary judgment to the Mobile Steamship Association, Inc. ("MSA"), the Philadelphia Marine Trade Association ("PMTA"), and other plaintiffs in No. 89–7505, after the district court's denial of summary judgment to CCC and grant of summary judgment to MSA in No. 89–7279, and after the district court's disposal of the parties' post-judgment motions in No. 89–7279.[1]

## I. FACTS

### A. *Background*

Both of these cases concern the relationship between CCC and Mobile Steamship Association/International Longshoremen's Association ("MSA–ILA") employee benefit plans. The first case, No. 89–7505, concerns the disposition of surplus monies held by an East–Coast–wide fund that was designed to cover shortfalls in contributions

1. The district court's disposition of the post-judgment motions in No. 89–7279 was the subject of a separate appeal, which this Court designated as No. 89–7451. Accordingly, while we are considering three consolidated appeals, only two litigations are involved.

to local longshoremen's pension plans such as the MSA–ILA Pension and Welfare Plans ("Mobile Plans") and the PMTA–ILA Pension, Welfare and Supplemental Unemployment Compensation Benefit Plans ("Philadelphia Plans"), which are involved here. The fund is called the Job Security Program ("JSP Program") and is administered by CCC.

The JSP Program grew out of a 1977 labor dispute between the International Longshoremen's Association, AFL–CIO ("ILA") and vessel carriers, stevedoring companies, and their employer associations. Up to that time, contributions to local port pension plans were based on the number of man-hours worked by ILA labor. The advent of containers, however, had begun to transform the shipping industry. Carriers began concentrating their calls in large mechanized ports such as New York, where the containers were transferred to trucks or railroads for distribution. As a result, there were fewer calls in smaller ports such as Mobile, fewer man-hours worked by ILA members in those ports, and fewer dollars contributed to the pension funds in those ports. The ILA demanded some form of protection for local pension funds from the problem of declining contributions.

CCC and its predecessor, the Job Security Program Agency, Inc. ("JSPA")[2], are associations of the shipping companies ("carriers") that signed contracts with the ILA and local port unions in order to form the JSP Program. CCC was formed by the carriers to carry out the terms of the JSP agreement (i.e., to assess amounts due to the JSP shortfall fund from individual carriers, and to pay local plans like the

Mobile and Philadelphia plans for shortfalls in contributions). CCC is empowered to negotiate for its members on JSP matters.

The JSP Program agreements provided that the carriers would pay a royalty assessment on each ton of cargo loaded or unloaded by ILA labor in ports from Maine to Texas. CCC would hold the assessments in a fund for use in paying shortfalls in local pension plan contributions. The carriers and the ILA (and its regional subdivisions) signed the first JSP agreement on November 13, 1977. A successor JSP agreement, also signed by the carriers and the ILA, was executed on May 27, 1980, covering a term from October 1, 1980 to September 30, 1983. In 1983, the parties did not sign a separate JSP agreement. The 1983 Maine to Texas "master contract"[3] between the ILA and employer associations did provide, however, that the JSP Program would be updated and extended by the carriers.

On September 5, 1986, the ILA and many of the employer associations, including CCC, signed a new master agreement, providing that the JSP Program would end, except for the purposes of meeting any existing obligations of the fund. This agreement further provided that "[a]ny surplus ... shall be discussed with the ILA." The Mobile and Philadelphia Plans, MSA, and PMTA (the Philadelphia employer group), did not participate in these negotiations and did not sign the 1986 master agreement.[4]

In 1988, CCC, the ILA, and a number of local port plans, employer associations, and local unions entered into a settlement agreement ("the 1988 Settlement Agree-

**2.** The parties and the record refer to CCC and JSPA interchangeably. Because CCC and JSPA are essentially the same entity, we refer to both as "CCC."

**3.** Collective bargaining in the longshore industry takes place on two levels. First, bargaining on a national level (Maine to Texas) takes place between the ILA, vessel carriers, and employer associations such as MSA, which represents stevedoring companies in the port of Mobile. The national bargaining results in a master agreement that fixes master terms of employment such as wages, hours, pension contributions,

and welfare contributions. Second, bargaining on a local level is between ILA locals and local employer associations. Local bargaining results in a local port agreement that incorporates the master agreement and also establishes terms and conditions of employment for the particular port.

**4.** MSA signed the 1980 and 1983 master agreements. The Council of North Atlantic Shipping Associations ("CONASA"), of which PMTA is a member, signed the 1977, 1980 and 1983 master agreements.

ment") concerning outstanding shortfall claims against CCC. Neither the Mobile nor the Philadelphia plans agreed to sign the 1988 Settlement Agreement. Under the 1988 Settlement Agreement, CCC paid $21,850,000 to settle $63,228,000 in outstanding shortfall claims.[5] As a result of the 1988 Settlement Agreement, CCC had a surplus of $57 million ("surplus").

The first case before this Court, No. 89–7505 [hereinafter "the surplus case"], concerns the disposition of this surplus. The Mobile and Philadelphia Plans contend that the JSP fund was given to the local port plans in exchange for ILA work completed and that, therefore, CCC is obligated to pay all monies remaining in the JSP fund to the local plans. CCC contends that the member carriers of CCC were obligated to contribute only those amounts necessary to cover shortfalls in contributions during the terms of the JSP agreements and that, therefore, any surplus can be retained by CCC or returned to the member carriers.

The second case before this Court, Nos. 89–7279 and 89–7451 [hereinafter "the withdrawal case"], concerns the withdrawal liability of CCC to the Mobile Plan under ERISA Section 4201, 29 U.S.C.A. § 1381. CCC contends that it is not an "employer" within the meaning of section 1381 and that it therefore has no withdrawal liability. MSA contends that CCC is a "contributing obligor" to the Mobile Plan and is, therefore, an employer subject to withdrawal liability under section 1381.

### B. *Proceedings in the District Courts*
#### 1. *The Surplus Case*

In the surplus case, the district court granted summary judgment to MSA and PMTA. The court concluded that the JSP agreement was the product of "interrelated collective bargaining agreements" involving the ILA, the carriers, the employer associations (including MSA and PMTA), and the ILA local unions, and that parties to the master agreements and the local agreements were also parties to the JSP agreement. Based on this conclusion, the court found that MSA and PMTA had standing to bring an action based on the JSP agreements.

Because the JSP agreements and master agreements did not mention the possibility of a surplus, the district court concluded that the agreements were ambiguous and that parol evidence should be admitted to determine the intent of the parties. It considered as parol evidence the parties' characterizations of the JSP Program as a "trust fund," an " 'insurance' program to protect local port plans," an "escrow or feeder fund," employer "contributions" to the local port plans, and a negotiated benefit intended as "compensation" for ILA labor. In addition, the court considered language from the JSP agreement indicating that money collected under the JSP Program could be used only to benefit the local port plans.

The district court also determined that the interpretation of the JSP agreement was governed by section 301 of the Labor Management Relations Act (the "LMRA"), 29 U.S.C.A. § 185(a), and the federal common law developed under that section. The court found that ERISA and the policies behind ERISA were one source of this federal common law. Further, the court found that the policies reflected in section 403 of ERISA, 29 U.S.C.A. § 1103(c), which prohibits the use of assets in an employee benefit plan to benefit an employer, apply to the JSP funds.[6] After considering the language of the contract, the parol evidence, and the federal common law, the court found that the contract restricted the JSP funds to uses benefitting the local port plans. The court, therefore, ruled that CCC could not refund any money to the carriers, that CCC must pay the Mobile and Philadelphia plans their pro rata shares of the surplus ($4,218,000 for the Mobile Plan and $15,276,000 for the Philadelphia Plan), and that MSA and PMTA could recover attorneys' fees.

---

**5.** CCC also agreed to distribute $30,500,000 to five ports that did not have pending shortfall claims as a distribution of "surplus" JSP funds.

**6.** The court also cited 29 U.S.C.A. § 186(c)(5) (LMRA) as reflecting a similar policy.

### 2. The Withdrawal Case

The dispute over CCC's withdrawal liability to the Mobile Plan began on December 21, 1987, when the Mobile Plan notified CCC by letter that the Plan had determined that CCC had completely withdrawn as an employer and was therefore obligated to pay the Plan withdrawal liability of $1,236,836. The Mobile Plan demanded that CCC pay the withdrawal liability in accordance with an installment schedule included in the letter.[7] On January 12, 1988, CCC asked the Mobile Plan to reconsider its determination that CCC had withdrawal liability to the Mobile Plan.[8]

On February 3, 1988, CCC commenced this action for a declaratory judgment that CCC is not an employer subject to withdrawal liability under the Multiemployer Pension Plan Amendments Act of 1980 ("the MPPAA"). On February 29, 1988, the Plan counterclaimed for an order holding CCC responsible for the withdrawal liability, directing CCC to pay the outstanding withdrawal liability plus interest pursuant to 29 U.S.C.A. § 1399(c)(5), and awarding the Mobile Plan attorneys' fees under 29 U.S.C.A. § 1132(g)(2). On July 25, 1988, CCC and the Mobile Plan filed cross motions for summary judgment, and on March 21, 1989, the district court entered its findings of fact, conclusions of law, and order.

The court found that the term "employer," as used in 29 U.S.C.A. § 1381(a), is meant to include a person who is obligated to contribute to a plan either as a direct employer or in the interests of an employer of the plan's participants.[9] Then the court determined that CCC was a person obligated to contribute to the Mobile Plan under interrelated collective bargaining agreements (the JSP agreements, the master agreements, and the local port collective bargaining agreements). Finally, it held that CCC was therefore an employer within the meaning of section 4202 of the MPPAA, 29 U.S.C.A. § 1382, and had withdrawal liability to the Mobile Plan.

The court directed the parties to arbitrate the amounts of interim payments to be made by CCC. The court rejected the Mobile Plan's request for attorneys' fees under 29 U.S.C.A. § 1132(g)(2), which authorizes awards of attorneys' fees where a fiduciary sues a contributor for delinquent contributions. *See* 29 U.S.C.A. §§ 1132(g)(2), 1145.

In a post-judgment order dated May 5, 1989, the district court ordered CCC to make all overdue payments of withdrawal liability with interest, and denied CCC's motion to pay the money into an escrow account. The court did not, however, order CCC to make the payments according to the schedule in the Mobile Plan's December 21, 1987 letter. The court also refused to accelerate payment of the entire amount of CCC's withdrawal liability under 29 U.S.C.A. § 1399(c)(5). Finally, the court denied the Mobile Plan's motion for liquidated damages and attorneys' fees under 29 U.S.C.A. § 1132(g)(2) because the Mobile Plan had offered no proof of a liquidated damages provision[10] or of costs and attorneys' fees.[11]

In sum, CCC appeals the grants of summary judgment under Federal Rule of Civil Procedure 56(c) in both cases. The Mobile Plan appeals the denial of interim withdrawal liability payments, interest, damages, and attorneys' fees in the withdrawal liability case.

---

**7.** Notification and demand of payment are required of a plan sponsor under 29 U.S.C.A. § 1399(b)(1) as soon as practicable after an employer's withdrawal.

**8.** Under 29 U.S.C.A. § 1399(b)(2)(A), an employer must request reconsideration of its withdrawal liability by the plan sponsor within 90 days.

**9.** This definition is drawn from the definition of "employer" set forth in Title I of ERISA, 29 U.S.C.A. § 1002(5), and from the definition of "withdrawal" set forth in 29 U.S.C.A. §§ 1383(a), 1385(a).

**10.** The Mobile Plan's contract (the MSSA–ILA Pension Plan) does not contain a liquidated damages provision.

**11.** The May 5, 1989 post-judgment ruling and a subsequent denial by the court of the Mobile Plan's motion to reconsider the May 5, 1989 order are the basis of the Mobile Plan's appeal No. 89–7451.

In this appeal we first consider whether the district courts in both cases erred in holding that the JSP agreement was the product of interrelated collective bargaining agreements and that, therefore, parties to the master agreements and the local agreements were parties to the JSP agreement and vice versa. Second, we consider whether the district court in the surplus case erred in holding that the JSP agreement was ambiguous and that parol evidence should be admitted. Third, we consider whether the district court in the surplus case erred in holding that the JSP funds should benefit the local plans exclusively. Fourth, we consider whether the district court in the surplus case erred in calculating the amount of the CCC surplus that should be paid to the Mobile and Philadelphia Plans. Fifth, we consider whether the district court in the withdrawal case erred in holding that CCC was an "employer" under the MPPAA and therefore subject to withdrawal liability under 29 U.S.C.A. § 1381(a). Sixth, we consider whether the district court in the withdrawal case erred in ruling that CCC had withdrawn from the Mobile Plan. Seventh, we consider whether the district court in the withdrawal case erred in refusing to order CCC to begin payments of withdrawal liability immediately on the basis of the Mobile Plan's schedule of payments. Finally, we consider whether the district court in the withdrawal case erred in ruling that the Mobile Plan was not entitled to attorneys' fees and liquidated damages under 29 U.S.C.A. § 1132(g)(2).

## II. STANDARD OF REVIEW

The district court orders granting summary judgment are subject to *de novo* review by this Court. *Shipes v. Hanover Ins. Co.*, 884 F.2d 1357, 1359 (11th Cir. 1989). The court must ask whether there is any genuine issue of material fact and whether the moving party is entitled to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552, 91 L.Ed.2d 265 (1986). The governing law determines what facts

are material. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The Court reviews the evidence and all factual inferences therefrom in the light most favorable to the party opposing the motion. All factual doubts are resolved in favor of the nonmovant CCC. *Hinesville Bank v. Pony Express Courier Corp.*, 868 F.2d 1532, 1534-35 (11th Cir.1989); *Buxton v. City of Plant City*, 871 F.2d 1037, 1040-41 (11th Cir.1989).

## III. DISCUSSION

### A. The JSP Agreement Was Part of a Group of Interrelated Collective Bargaining Agreements

CCC argues that the only parties to the JSP Agreements were the carriers and the ILA, and that the carriers were not parties to the master contracts and local port agreements. CCC believes that the district courts in both cases erred by holding that the JSP agreement was part of a group of interrelated collective bargaining agreements. The interpretation of an unambiguous contract is a question of law, reviewable *de novo* by this Court. *International Bhd. of Boilermakers v. Local Lodge D111*, 858 F.2d 1559, 1561 (11th Cir. 1988). The district court's determination that a contract is ambiguous is also a question of law. *Id.* A contract term is ambiguous if it is reasonably susceptible to more than one interpretation. *Id.* If a district court determines that a contract is ambiguous and resorts to parol evidence in order to determine the intent of the parties, the court's determination of the parties' intent is one of fact and is subject to clearly erroneous review in this Court. *Brewer v. Muscle Shoals Bd. of Educ.*, 790 F.2d 1515, 1519 (11th Cir.1986).

The form and language of the JSP agreements and the master contracts unambiguously indicate that the signatories of each intended the incorporation by reference of the JSP agreement in the master contracts. On the one hand, the signatories to the master agreement [12] incorporat-

12. The master agreement consists of one page, setting out wage increases and referring to other

ed the JSP agreement into the master agreement. The 1977 master agreement stated,

> The following is agreed to by NYSA, CONASA, and ILA in final and complete settlement of the seven (7) master contract issues:
>
> &ast; &ast; &ast; &ast; &ast; &ast;
>
> 6. **Containerization**
> As set forth in appended Agreement and appended JSP Program, as applicable to New York and CONASA ports.[13]

The 1977 and 1980 JSP agreements were attached to the master contracts. This form and language in the master contracts clearly state the intention of the signatories to incorporate the JSP agreement into the master contracts.[14]

On the other hand, the signatories to the JSP agreement contemplated an incorporation by reference of the JSP agreements into the master contracts and the local contracts. Paragraph 9 of the JSP agreement, entitled *"Signatories"* mandates that each local port association (e.g., PMTA and MSA) subscribe to the JSP agreement and agree to be bound by its terms.[15]

The history of the 1977 ILA labor negotiations also supports this interpretation. The ILA refused to sign the master contract and struck the carriers, refusing to unload their ships until a JSP agreement was signed. The carriers signed the JSP agreement in order to induce the ILA to sign the master contract and the local agreements and resume unloading the carriers' ships. When the carriers signed the JSP agreement, the ILA and the employer associations immediately signed the master contract. Accordingly, both district courts were correct in holding that the master contracts and the JSP agreements were part of interrelated collective bargaining agreements.[16]

### B. *The Surplus Case*
1. *The JSP Agreement Was Ambiguous on the Disposition of Surplus Funds*

 CCC also argues that the JSP agreement was unambiguous and that,

---

documents. The skeletal form of the master agreement indicates that the referenced documents were intended to be incorporated into the master agreement. The master agreement would not be complete without the referenced documents.

**13.** The 1980 master contract was in the same form and had similar language. The 1983 master contract provided that "the JSP program shall be updated and extended by the Carriers."

**14.** Incorporation by reference is not uncommon in labor agreements. *See, e.g., Boilermakers,* 858 F.2d at 1561 (reading together union constitution and merger agreement); *McDonald v. Hamilton Elec., Inc. of Fla.,* 666 F.2d 509, 512 (11th Cir.1982) (letters of assent to collective bargaining agreement incorporate only those provisions in the agreement at the time of the letter of assent).

**15.** The JSP agreements contained the following provision:

> 9. **Signatories**
> Each Carrier, private or governmental, which utilizes or contracts for employees covered by this agreement shall be required to execute this agreement and to furnish any undertaking required for faithful performance of the requirements of this agreement, provided, however, that *no Carrier shall be required to furnish such an undertaking to any local port association unless such association subscribes*

*to this agreement and agrees to be bound by its terms and conditions.*
(emphasis added)

**16.** In *JSP Agency, Inc. v. American Sugar Refining Co.,* 752 F.2d 56 (2d Cir.1985), the Second Circuit held that the JSP agreement was not incorporated into the master contract and therefore that parties to the master contract were not bound by the JSP agreement. The court relied on a concession by CCC's attorney at trial that the JSP agreement and the master agreement were separate documents and that parties to the master agreement were not parties to the JSP agreement. *Id.* at 62. Given CCC's position in that case, CCC's concession was fatal (CCC was attempting to collect assessments from a stevedoring company whose agent had signed the master agreement but not the JSP agreement and, therefore, CCC had to argue that signatories to the master contract were bound by the JSP agreement). CCC cannot use its blunder in the Second Circuit to defeat a finding of incorporation by reference in this case.

The Second Circuit assumed that the JSP agreement was incorporated into the master contract in *Korea Shipping Corp. v. New York Shipping Assoc.,* 880 F.2d 1531 (2d Cir.1989). "[I]n signing the master contract and the [local port agreement] the carriers obligated themselves to pay 'job security program assessments' in order to aid in the funding of shortfalls in certain longshore pension, welfare, and trust funds." *Id.* at 1534.

therefore, the district court in the surplus case erred in referring to parol evidence in order to determine the intentions of the parties. Whether a contract is ambiguous is a question of law which this Court reviews summarily. *Boilermakers*, 858 F.2d at 1561. A contract is ambiguous if it is susceptible to more than one meaning. *Id.*

■ CCC's argument lacks foundation. Nothing in the JSP agreements or the master contracts even mentioned the possibility of a surplus until the 1986 master agreement. Also, the contracts specified no cutoff date for the protection extended to employees under the JSP Program. Thus, the district court was correct in holding that the contracts were ambiguous and in admitting parol evidence in order to discern the parties' original intent as to the disposition of surplus funds. *International Union of United Auto Workers v. Yard–Man, Inc.*, 716 F.2d 1476, 1481 (6th Cir. 1983) (considering the course of conduct of the parties); *see Communications Wkrs. of Am. v. Southwestern Bell*, 415 F.2d 35, 40–41 (5th Cir.1969).

CCC argues that the "term" clause of the JSP agreement, which stated that the JSP agreement would remain in effect for a period of three years, and the "JSP Tonnage Assessment" agreement, which limited the obligations of the carriers to contribute to the JSP Program to three year terms, cut off the JSP Program's shortfall protection upon the expiration of each three year term.[17] In *Weimer v. Kurz–Kasch, Inc.*, 773 F.2d 669 (6th Cir.1985), and *Yard–Man*, 716 F.2d at 1476, the Sixth Circuit held that a general term clause in a collective bargaining agreement does not imply a cutoff date for other clauses of the agreement that have no durational language. *Weimer*, 773 F.2d at 675–76; *Yard Man*, 716 F.2d at 1482–83. We fully concur with the Sixth Circuit's reasoning in *Weimer* and *Yard–Man*, *see United Steelworkers of Am. v. Connors Steel*, 855 F.2d

1499, 1505 (11th Cir.1988). Even in light of the term clauses, therefore, the lack of a cutoff date leaves the duration of the JSP agreement's shortfall protection (and thus the intended disposition or surplus CCC funds) ambiguous.

### 2. The JSP Funds Were Intended to Benefit the Local Plans
#### a. The Contract Language and Parol Evidence

■ CCC argues that the district court erred in holding that the parties intended CCC funds to benefit the local plans exclusively because the parties never intended that the carriers would pay into CCC any more than was necessary to cover the shortfalls that occurred during the terms of the JSP agreements. Under the JSP agreements, CCC was to adjust the level of assessments on a quarterly basis and increase, decrease, or suspend the assessments payable to CCC depending on CCC's anticipated needs. Attachment B, the JSP Tonnage Assessment, provided: "On or about April 1, 1978 and on a quarterly basis thereafter, the Carriers shall estimate the total obligations for shortfall incurred to date from all sources including information supplied by the local Port Associations and shall either increase, decrease, adjust or suspend such assessment, depending on experience." Based on this passage, CCC argues that the only purpose of the tonnage assessments was to pay for the shortfalls that occurred during the term of the agreements.

The flexible nature of the tonnage assessments is CCC's best argument for returning surplus funds to the carriers. If the carriers mistakenly overpaid when contributing to CCC, then it would seem fair to return the surplus funds to them. The flexible nature of the JSP tonnage assessments, however, does not change the interpretation of the contract under federal

---

**17.** In arriving at the conclusion that the JSP agreement does not provide for return of funds to the carriers upon termination of the program, the district court considered the limitation on payouts in the JSP Tonnage Assessment agreement. The court held that the three year

term specified in the JSP Tonnage Assessment agreement applied only to the obligation of the carriers to pay into the fund through tonnage assessments, and not to the protection that the JSP program extends to the local port plans.

common law. The district court's interpretation is correct for two reasons: other language in the contract, and federal labor policy.

The Tonnage Assessment attachment to the 1977 JSP agreement provides:

> Such tonnage assessment amounts shall be collected as necessary from the Carriers by the administrative agency (to be known as [CCC]) created by the Carriers which shall pay out the shortfall payments required by this Agreement.... [CCC] shall hold such amounts in interest-bearing accounts or in appropriate investment accounts and shall pay out such amounts only for obligations under the JSP Program and the expenses of administration thereof.

This language from the agreement, and the parties' characterizations relied on by the district court,[18] support the conclusion that CCC funds were intended to benefit the local port plans only and should not be returned to the carriers.[19]

### b. Federal Labor Policy

■ The court should review its interpretation of a labor-management contract for consistency with federal labor policy. *Yard–Man*, 716 F.2d at 1480. The court's interpretation of the contract need not affirmatively promote a particular policy, but it should not violate a basic principle of federal labor law. *Id.* at 1480. ERISA section 403(c)(1), 29 U.S.C.A. § 1103(c)(1), provides that assets of an employee benefit plan shall never inure to the benefit of an employer and shall be held for the exclusive benefit of plan participants and their beneficiaries. Section 1103(c)(2)(A)(ii) provides that if an employer makes a contribution to a multiemployer plan by a mistake of fact or law, the employer may obtain a refund from the plan, but only within six months of the plan administrator's determining that a mistake occurred. Although

the JSP Program does not fall within ERISA as a matter of law, the federal common law for interpreting labor-management contracts draws on federal labor statutes such as ERISA. *See Textile Workers v. Lincoln Mills*, 353 U.S. 448, 456–57, 77 S.Ct. 912, 917–18, 1 L.Ed.2d 972 (1957). Thus, the policy of section 1103(c)(2)(A) applies to the interpretation of the contracts in this case.

Section 1103(c) reflects a policy of limiting an employer's access to monies once he has paid them into a fund for the benefit of employees, even if the payment was by mistake. In this case, CCC argues that the tonnage assessments were mistakenly too high and that, therefore, the carriers deserve a refund.

The Ninth Circuit recently rejected CCC's position in a case where employers sought the return of surplus funds in an ERISA trust that was terminating. *British Motor Car Distrib. v. San Francisco Automotive Indus. Welfare Fund*, 882 F.2d 371 (9th Cir.1989). In that case, the employers argued that the surplus was the result of incorrect actuarial projections of the fund's needs and that this was a mistake of fact that entitled them to a refund under section 1103(c)(2)(A)(ii). *Id.* at 374. The court rejected this argument and held that overly generous contributions to an employee trust that result in a surplus are not a mistake of fact for purposes of section 1103(c)(2)(A)(ii) unless they are the result of clerical or arithmetic error. Incorrect actuarial assumptions, the court said, are not a basis for finding mistake of fact. *Id.* at 375–77. The Ninth Circuit ruled that the surplus funds should be transferred to successor trusts in favor of the employees. *Id.* at 378–79. We agree with the Ninth Circuit and hold that under federal common law, as reflected in ERISA, CCC cannot refund any assessments to the carriers.

---

**18.** *See* Part I.B.1., *supra*. The district court's finding of the intent of parties is subject to clearly erroneous review to the extent that the court relied on extrinsic evidence to reach the finding. *Brewer*, 790 F.2d at 1519.

**19.** CCC also cites a provision in its certificate of incorporation as evidence of the parties original

intent that funds could be returned to the carriers. That provision, however, related to dissolution of CCC, which has not yet occurred. Moreover, it is unlikely that the parties would have looked to CCC's certificate of incorporation to express their intent as to the ultimate disposition of CCC assessments.

CCC argues that the policies of ERISA do not apply because the JSP Program was neither an employee benefit plan within ERISA nor a fringe benefit plan within 29 U.S.C.A. § 186(c)(5). In support of its argument, CCC cites a letter opinion from the Secretary of Labor that CCC (then JSPA) is not an employee benefit plan within ERISA.[20] CCC's argument fails to address the reasoning of the district court. As the district court conceded, the JSP Program does not fall under ERISA or section 186(c)(5). That finding, however, does not resolve the question of the proper characterization of surplus funds held by CCC. The district court did not hold that ERISA itself applied; the federal common law of labor applied, *Lincoln Mills*, 353 U.S. at 456–57, 77 S.Ct. at 917–18, and the content of the federal common law is determined by reference to federal labor policies such as those reflected in ERISA and section 186(c)(5). *Id.*[21] Moreover, as the district court observed, the JSP Program was created to benefit the local port plans. Because the assessments that make up the surplus were collected for the purpose of benefiting ERISA–governed funds, the policies behind ERISA are relevant to the question of what should happen to the surplus. Accordingly, CCC's argument that the district court erred in referring to ERISA and section 186(c)(5) is meritless.

### 3. *Restitution*

The district court awarded the Philadelphia and the Mobile plans restitution damages. In calculating the amount of damages the court's stated purpose was to award the Philadelphia and Mobile plans a portion of CCC's surplus funds proportional to the total shortfall awards made by CCC to the Mobile and Philadelphia plans during the lifetime of the JSP Program. Under federal common law, the federal courts must fashion effective remedies for the impairment of federally created rights in the field of labor relations. *Local Div. 732, Amalgamated Transit Union v. Metropolitan Atlanta Rapid Transit Auth.*, 667 F.2d 1327, 1345 (11th Cir.1982); *Rozay's Transfer v. Local Freight Drivers, Local 208*, 850 F.2d 1321, 1335 (9th Cir. 1988); *see Lincoln Mills*, 353 U.S. at 459, 77 S.Ct. at 919.

The district court's calculations were as follows:

(1) total shortfall payments by CCC = $75,713,312;

(2) total shortfall payments to Philadelphia plan = $20,345,209 (26.8%);

(3) total shortfall payments to Mobile plan = $5,629,027 (7.4%);

(4) total surplus in CCC fund = $57,000,000;

(5) Restitution due Philadelphia plan = $15,276,000;

(6) Restitution due Mobile plan = $4,218,000

CCC criticizes this damages calculation on three grounds. First, CCC argues that if the purpose of the tonnage assessment was to compensate ILA laborers for work completed, then the court should have distributed the surplus among the port plans in proportion to the number of tons of cargo unloaded by ILA laborers in each port. This suggestion ignores the purpose of the JSP agreement, which was to channel funds to port plans where shortfalls occurred due to decreases in the number of tons unloaded by ILA labor. CCC's proposal would do the opposite.

Second, CCC challenges the district court's figures. CCC alleges that $37,000,000 of the $57,000,000 surplus is in the form of credit memos from the carriers, and should not be included in the surplus. This would reduce the surplus to $20,000,-

---

**20.** Dept. of Labor Opinion 81–48A (May 28, 1981) (available on LEXIS).

**21.** CCC also argues that under *Firestone Tire and Rubber Co. v. Bruch,* —— U.S. ——, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989), its decision to refund money to the carriers can be reversed only if it was arbitrary and capricious or an abuse of discretion. *Firestone* involved a trust adminis-

trator's decision to deny the severance benefit claims of employee beneficiaries under a plan. *Id.* 109 S.Ct. at 951. The decision of a plan administrator to return money to an employer is clearly different from the decision at issue in *Firestone* and falls squarely within 29 U.S.C.A. § 1103(c). CCC's argument based on *Firestone,* therefore, is meritless.

000 (CCC states that the final figure is $24,000,000). To allow this re-characterization of funds would defeat the purposes of ERISA section 403, 29 U.S.C.A. § 1103(c), by allowing money due to CCC to inure to the benefit of the carriers. This argument, therefore, must fail.

Third, CCC argues that the total shortfalls paid under the JSP Program should include the $30,500,000 that CCC paid to other ports in the 1988 Settlement Agreement. CCC argues that the payment of this amount "was thoroughly consistent with the shortfall protection feature of the JSP Agreement." CCC cites the affidavit of former ILA president Thomas W. Gleason, who helped to create the JSP Program, to support this argument. CCC also argues that the total shortfall payments figure should be increased by $398,828 to reflect the amount that the Mobile plan received in its May 5, 1988, settlement agreement.[22] The plans allege that the $30,500,000 paid by CCC in the 1988 Settlement Agreement was not a shortfall payment because CCC characterized the payment as "surplus" and because the five ports paid did not have outstanding shortfall claims. Accordingly, there is a genuine issue of material fact over the proper characterization of the 1988 Settlement Agreement payments, and we reverse the district court's damages award and remand the issue of damages to the district court. *See Boilermakers,* 858 F.2d at 1561.

## C. *The Withdrawal Liability Case*

On its appeal of the district court's grant of summary judgment in the withdrawal liability case, CCC challenges the district court's determination that CCC is an "employer" for purposes of 29 U.S.C.A. § 1382, and the district court's determination that CCC is subject to withdrawal liability under section 1381. The Mobile Plan cross-appeals the district court's failure to order CCC to immediately begin interim payments under 29 U.S.C.A. § 1401(d) and the district court's failure to award liquidated damages and attorneys fees to the Mobile Plan under 29 U.S.C.A. § 1132(g)(2).

### 1. *The Contributing Obligor Test for Determining Who Is an Employer*

Congress enacted ERISA, 29 U.S.C.A. §§ 1001–1461, in order to prevent losses to employees and their families caused by the failure of vested pension benefits. Congress was concerned that pension benefits were failing because employers were terminating their contributions to pension plans before the plans accumulated sufficient funds to cover all of the employee benefits that had been promised. *Pension Benefit Guaranty Corp. v. R.A. Gray & Co.,* 467 U.S. 717, 720, 104 S.Ct. 2709, 2713, 81 L.Ed.2d 601 (1984); *Korea Shipping Corp. v. New York Shipping Ass'n,* 880 F.2d 1531, 1536 (2d Cir.1989). Congress passed the MPPAA as an amendment to ERISA in order to protect multi-employer pension plans from the financial burdens that result when one employer withdraws from a multi-employer plan without first funding uncovered liabilities of the plan attributable to the employer. *R.A. Gray & Co.,* 467 U.S. at 722–23 & n. 2, 104 S.Ct. at 2714–15 & n. 2; *Korea Shipping,* 880 F.2d at 1536–37; 29 U.S.C.A. § 1001a(a)(4)(A).

The MPPAA imposes withdrawal liability on an "employer" when it withdraws from a multi-employer plan. 29 U.S.C.A. § 1381(a). A withdrawal occurs when an employer ceases to have an obligation to contribute under a plan or ceases all operations covered under a plan. *See* 29 U.S.C.A. § 1383(a).[23] The MPPAA does not itself contain a definition of the word "employer." Title I of ERISA, however, contains a definition: "The term 'employer' means any person acting directly as an employer, or indirectly in the interest of an employer, in relation to an employee benefit plan; and includes a group or association of employers acting for an employer in such capacity." 29 U.S.C.A. § 1002(5). In *Nachman Corp. v. Pension Benefit Guar-*

---

**22.** This would leave the total shortfall payments made by CCC at $106,612,140.

**23.** An employer partially withdraws from a plan when his contributions to a plan decline by 70%, or there is a partial cessation of his obligation to contribute. 29 U.S.C.A. § 1385(a).

*anty Corp.*, 446 U.S. 359, 100 S.Ct. 1723, 64 L.Ed.2d 354 (1980), the Supreme Court stated that "Title I definitions do not apply elsewhere in the Act of their own force, though they may otherwise reflect the meaning of the terms defined as used in other titles." *Id.* at 370 n. 14, 100 S.Ct. at 1731 n. 14.

The Second Circuit has concluded that the definition of employer under the MPPAA has been left to the courts. *Korea Shipping*, 880 F.2d at 1536–37. The *Korea Shipping* court held that the Title I definition of "employer" should apply to the MPPAA because the policies behind the MPPAA make the expansive Title I definition more appropriate than the common law definition, which looks for direct employer-employee relationships (e.g., direct supervision, direct payment). *Id.* at 1537. The Second Circuit approved of a definition of the term "employer" as " 'a person who is obligated to contribute to a plan either as a direct employer or in the interest of an employer of the plan's participants.' " *Id.* (quoting district court). This definition looks for a "contributing obligor" rather than a *common law employer.*

The Second Circuit argued that the common law definition of employer would frustrate the purposes of the MPPAA by encouraging employers to insulate themselves from liability under the MPPAA by entering into agreements under which entities that were not direct employers of a plan's beneficiaries would make pension plan contributions. In such a scenario, the employers could effectively withdraw from a plan by terminating their relationships with the direct employer without incurring withdrawal liability. *Id.* at 1539–40. Given the Congressional policy of ensuring the financial stability of pension plans, the court concluded that "employer" in the MPPAA must include all parties that are obligated to contribute to a plan for the benefit of a plan's participants. *Id.* at 1537.

**24.** The MPPAA calculates withdrawal liability on the basis of a party's prior contribution commitments, *not on the number of employees.*

■ The contributing obligor test drawn from Title I of ERISA furthers Congress's purposes in passing the MPPAA because it prevents a contributor to a plan from withdrawing its support without covering its share of unfunded liabilities.[24] By sweeping in direct employers, indirect employers, intermediaries, and employer associations, the contributing obligor definition ensures that no employer can use intricate corporate structures to avoid withdrawal liability. *See* ERISA section 3(5), 29 U.S.C.A. § 1002(5). We hold, therefore, that the contributing obligor definition drawn from Title I applies to the term "employer" in section 1381(a).

■ CCC also argues that even if the contributing obligor definition does apply, CCC is not a contributing obligor. In *Korea Shipping*, the alleged "employers" were carriers that called at the port of New York and utilized stevedoring companies to load and unload their ships. The stevedoring companies, not the carriers, employed ILA labor. Under the master agreement and the local port agreement ("the GCA"), the carriers were obligated to pay tonnage assessments to the local employer association ("NYSA"), which, in turn, paid the assessments to the local port plan. *Korea Shipping*, 880 F.2d at 1534. Under the contributing obligor test, the court held that the carriers were employers subject to withdrawal liability. *Id.* at 1539.

The court rejected the carriers' claim that they were not obligated to contribute to the pension plan. The court relied on a provision in the GCA that parallels a similar provision in the JSP agreement.

"[E]ach vessel carrier ... shall be responsible for an assessment amount per ton on each ton of non-excepted cargo loaded or discharged in the Port of New York," ... those assessments "shall be collected by the direct employer [the stevedores] from each of the carriers and shall be paid to NYSA for immediate transmittal to the NYSA–ILA Fringe Benefits Escrow Fund."

*See* 29 U.S.C.A. § 1391(b)(2)(E)(ii), (b)(3), (b)(4)(D).

*Id.* The language in the JSP agreement is as follows:

Such tonnage assessment amounts shall be collected as necessary from the carrier by ... [CCC] which shall pay out the shortfall payments required by this Agreement ... [CCC] shall hold such amounts in interest bearing accounts or in appropriate investment accounts and shall pay out such amounts only for obligations under the JSP Program....

*JSP Agreement, Attachment B* at 2.

CCC is clearly a contributing obligor. Under the JSP agreements, the carriers, through CCC, were obligated to pay money to the pension funds to cover shortfalls. That was the very purpose of forming JSPA, Inc., CCC's predecessor. The carriers, therefore, are subject to withdrawal liability through CCC.

CCC also argues that even under the contributing obligor test it is not subject to withdrawal liability because the obligation that triggers employer status is the promise to provide benefits, rather than the promise to provide contributions. This argument is meritless. The MPPAA imposes withdrawal liability when an employer ceases to have "an obligation to contribute" to a plan. 29 U.S.C.A. §§ 1383(a)(1), 1385(a). Also, withdrawal liability is calculated on the basis of the "contribution required to be made under [a] plan by the employer ...," 29 U.S.C.A. § 1391(b)(2)(E)(ii), and not on the basis of the benefits that the employer promised to supply to plan participants. *See id.; see also* 29 U.S.C.A. §§ 1391(b)(3)(B), (b)(4)(D).

The Second Circuit reached a similar conclusion in *Korea Shipping.* "Once the contributions are agreed upon and made, they become the focus by which the withdrawing contributor's share of the plan's unfunded vested benefits pursuant to 29 U.S. C.[A.] § 1391 is determined." *Korea Shipping,* 880 F.2d at 1540. The obligation of CCC to contribute to the local plans therefore provides the basis for imposing withdrawal liability upon CCC.

■ CCC also argues that it was not a party to the local port plan and therefore had no obligation to contribute under the Mobile Plan. Because the local port contracts, the master contract, and the JSP agreement are "interrelated collective bargaining agreements," *see* Part III, A, *supra,* CCC is obligated to contribute to the Mobile Plan. Moreover, even if CCC is not a direct party to the Mobile local port agreement, it still had an obligation to contribute under the JSP agreement. Under 29 U.S.C.A. § 1392, an "obligation to contribute" is "an obligation ... arising—(1) under one or more collective bargaining (or related) agreements...." The JSP agreement was a "related" agreement.[25] Accordingly, CCC is subject to withdrawal liability through its contractual obligations.[26]

2. *The District Court Correctly Held that CCC Withdrew from the Plan and Actually was Liable under 29 U.S.C.A. § 1381(a)*

■ CCC contends that the only question that was before the district court was

25. In reaching the conclusion that the JSP agreement was part of "interrelated collective bargaining agreements," the district court stated, "It simply cannot be contended that the JSP Agreement, which was specifically referred to in the Master Contracts, was neither itself the product of collective bargaining nor related to the collective bargaining agreement between [MSA] and the Mobile locals."

26. In *Alspaugh v. JSP Agency, Inc.,* CCC settled a suit by the Mobile Plan for shortfall payments under the JSP program. These were the only payments that the Mobile Plan ever received from CCC. CCC now argues that because the plan's accounting records did not list CCC as an employer, but characterized payments from CCC as "settlement of lawsuit," CCC never had a contractual duty to contribute to the Mobile

Plan. The settlement paid by CCC, however, supports the proposition that CCC had a contractual obligation to contribute to the Mobile Plan. The settlement concerned CCC's contractual obligation to make shortfall payments to the Mobile Plan.

CCC also argues that the Mobile Plan must show some change in position in reliance on the JSP payments before withdrawal liability can apply. The Second Circuit rejected this argument in *Korea Shipping.* "[W]ithdrawal liability is designed as a compensatory mechanism to counterbalance shrinkages in the contribution base of covered plans.... [And t]hus the Fund need not prove specific harm resulting from the withdrawals...." *Korea Shipping,* 880 F.2d at 1539.

whether CCC is an "employer" under the MPPAA. The issue of liability, CCC argues, should have been preserved for an arbitrator and should not have been resolved by the district court.

The MPPAA provides, "Any dispute between an employer and the plan sponsor of a multi-employer plan concerning a determination made under sections 1381 through 1399 of this title shall be resolved through arbitration." 29 U.S.C.A. § 1401. Courts have held, however, that when a party seeks a determination from a court that it was never an employer under the MPPAA the court may rule on the issue. *See, e.g., Park South Hotel Corp. v. New York Hotel Trades Council,* 851 F.2d 578, 582 (2d Cir.1988) (arbitration not required where (1) case presents no factual issues and only questions of statutory interpretation, (2) parties agreed that arbitration was unnecessary, (3) the suit was filed before the period for seeking arbitration had run, and (4) judicial economy would not be served by remanding the case for arbitration); *Flying Tiger Line v. Teamsters Pension Trust Fund,* 830 F.2d 1241, 1253 (3d Cir. 1987) (citing *Dorn's Transp. v. Teamsters Pension Trust,* 787 F.2d 897, 903 (3d Cir. 1986) (arbitration not necessary in rare cases where (1) issue is not one on which arbitrator has expertise, (2) arbitration was not likely to moot further proceedings, and (3) arbitration would not help to develop factual record to assist the district court)).

In the instant case, the district court appropriately determined that CCC was an employer and that withdrawal had taken place. The issue of whether CCC was an employer was one of statutory interpretation in which an arbitrator would have no particular expertise. *Dorn's,* 787 F.2d at 903. The suit was filed before the period for initiating arbitration had run. *Park South Hotel,* 851 F.2d at 582. Because CCC was likely to appeal any adverse ruling by the arbitrator, judicial economy would not have been served by requiring arbitration. *Dorn's,* 787 F.2d at 903. And an arbitrator would not have helped to develop a factual record on the issues of statutory interpretation or on the issue of withdrawal because both parties agree that the JSP Program is ending. *Id.*

Once the court had determined that CCC was an employer within the meaning of 29 U.S.C.A. § 1381(a), the issue of whether CCC had withdrawal liability was in effect decided. It is undisputed that the 1986 master agreement ended the JSP Program. Accordingly, the district court did not err in noting that the only remaining issue was the amount of CCC's liability and remanding that issue to the arbitrator. *See Central States Pension Fund v. 888 Corp.,* 813 F.2d 760, 767 (6th Cir.1987) (where parties dispute the proper amount of employer's withdrawal liability, the issue should be remanded to an arbitrator).

### 3. *Interim Payments by CCC*

█ The Mobile Plan cross-appeals the district court's denial of the plan's motion for an order directing CCC to make interim payments to the plan while the parties pursue arbitration. In its March 21, 1989 order, the district court stated that CCC was "unquestionably obligated under 29 U.S. C.A. § 1401(d) to make interim payments...." The court concluded, however, that because it had stayed arbitration pending resolution of CCC's employer status, it should not fault CCC for failing to make interim payments. The court then directed the parties to arbitrate the issue of interim payments.[27] In its May 5, 1989 order, the district court directed CCC to pay all overdue withdrawal payments, but did not refer the parties to the payment schedule in the Mobile Plan's December 21, 1987 letter.

The MPPAA requires an employer to make interim payments during the pendency of any dispute over withdrawal liability.

27. The district court did not explain why its order staying arbitration had, or should have had, the effect of relieving CCC of its duty to make interim payments pending arbitration under 29 U.S.C.A. §§ 1399(c)(2) and 1401(d). A stay of arbitration does not suspend the employer's duty to make interim payments, which, by definition, applies during the interim between demand by the plan administrator and the decision by the arbitrator or a court. *See* 29 U.S. C.A. § 1401(d).

*See* 29 U.S.C.A. §§ 1399(c)(2), and 1401(d). Section 1399(c)(2) provides:

> Withdrawal liability shall be payable in accordance with the schedule set forth by the plan sponsor under subsection (b)(1) of this section beginning no later than 60 days after the date of the demand notwithstanding any request for review or appeal of determinations of the amount of such liability or of the schedule.

Under 29 U.S.C.A. § 1401(d), "[p]ayments shall be made by an employer in accordance with the determinations made under this part [by the plan] until the arbitrator issues a final decision...." This language is mandatory, and leaves the court with no discretion not to order interim payments. *See Pantry Pride, Inc. v. Retail Clerks Tri–State Pension Fund*, 747 F.2d 169, 173 (3d Cir.1984) (Hunter, J., dissenting).[28]

The court should have ordered CCC immediately to begin interim payments according to the Mobile Plan's December 21, 1987 letter. *See M. Hayes Lines, Inc. v. Centr. States Southeast and Southwest Areas Pension Fund*, 814 F.2d 297, 299, 301 (6th Cir.1987); 29 U.S.C.A. §§ 1399(c)(2) and 1401(d). These payments should continue until the dispute is resolved by the arbitrator or through judicial review. 29 U.S.C.A. § 1401(d).[29]

### 4. Attorneys' Fees

▮▮▮ Finally, the Mobile Plan asserts that it is statutorily entitled to damages and attorneys' fees for the costs of this action. Under section 1132(g)(2), when a plan sponsor prevails in an action to enforce delinquent payments, the court must award the plan sponsor the following:

> "(A) the unpaid contributions,
> (B) interest on the unpaid contributions,
> (C) an amount equal to the greater of—
> (i) interest on the unpaid contributions, or
> (ii) liquidated damages ... [and]
> (D) reasonable attorney's fees and costs of the action, to be paid by the defendants...."

29 U.S.C.A. § 1132(g)(2). An award of attorneys' fees in a delinquent payment case is mandatory under the statute. *See United Retail and Wholesale Employees v. Yahn & McDonnell, Inc.*, 787 F.2d 128, 134–35 (3d Cir.1986), *aff'd by equally divided court*, 481 U.S. 735, 107 S.Ct. 2171, 95 L.Ed.2d 692 (1987); *Plumbers' Pension Fund Local 130 v. Domas Mech. Contractors, Inc.*, 778 F.2d 1266, 1271 (7th Cir. 1985); *Operating Engineers Pension Trust v. Reed*, 726 F.2d 513, 514 (9th Cir. 1984) (Kennedy, J.); *see also Nachwalter v. Christie*, 805 F.2d 956, 961 (11th Cir.1986) (citing *Plumber's Pension Fund*, 778 F.2d at 1271). Under the statute, the district court must award the Mobile Plan the unpaid withdrawal payments, double interest[30] on those contributions, and attorneys' fees. *See United Retail and Wholesale*, 787 F.2d at 134–35; 29 U.S.C.A. § 1132(g)(2).[31]

---

**28.** To succeed on a claim for interim payments, a plan needs only to show that it complied with the MPPAA's procedural requirements: (1) determine that the employer has withdrawn from the multiemployer plan; (2) determine the amount of the employer's withdrawal liability; (3) notify the employer of the amount of liability and payment schedule; and (4) demand payment according to the schedule. *Bowers v. Transportes Navieros Ecuadorianos*, 719 F.Supp. 166 (S.D.N.Y.1989); 29 U.S.C.A. §§ 1382, 1391(b)(1). The MPPAA scheme, which requires payment of withdrawal liability pending the resolution of any dispute, is consistent with due process.

**29.** In its May 5, 1989 order, the district court directed CCC to "comply with 29 U.S.C. §§ 1399(c) and 1401(d) by paying all overdue withdrawal liability payments plus interest as calculated under the applicable regulation." At that time, the Mobile Plan also sought acceleration of all of CCC's withdrawal liability payments. This relief is unavailable under 29 CFR § 2644.2(c), which does not allow acceleration when a party has sought arbitration. *ILGWU Nat'l Retirement Fund v. Levy Bros. Frocks, Inc.*, 846 F.2d 879, 882 (2d Cir.1988).

**30.** The plan has no liquidated damages provision. Accordingly, the plan should receive interest on the unpaid contributions twice: once under § 1132(g)(2)(B), and once under § 1132(g)(2)(C)(i).

**31.** CCC argues that the Mobile Plan waived its right to attorneys' fees, interest, and damages because the Mobile Plan failed to file a request for attorneys' fees within ten days prior to the expiration of the period for filing an appeal

## IV. CONCLUSION

For the foregoing reasons, we:

AFFIRM the district court's holding in the surplus case that the CCC funds must benefit the local plans;

REVERSE the district court's damages award in the surplus case and REMAND the case for trial on the issue of damages;

AFFIRM the district court's holding in the withdrawal liability case that CCC is an "employer" within the meaning of 29 U.S.C.A. § 1381(a);

AFFIRM the district court's holding that CCC is liable for withdrawal liability, and direct the district court to send the issue of the amount of liability to arbitration pursuant to 29 U.S.C.A. § 1401;

REVERSE the district court's holding that CCC does not have to begin interim payments pending litigation of its withdrawal liability and REMAND with directions to order CCC to begin interim payments in accordance with the schedule set forth in the Mobile Plan's December 21, 1987 letter; and

REVERSE the district court's holding that the Mobile Plan is not entitled to liquidated damages and attorneys' fees, and direct the district court to award the Mobile Plan (1) the unpaid withdrawal payments, and, upon proper motion, (2)(a) double interest on those contributions, and (b) attorneys' fees.

---

from the district court's March 21, 1989 order dismissing CCC's complaint. *See* S.D.Ala.R. 28 (upon final judgment or partial judgment made final by the court pursuant to Fed.R.Civ.P. 54(b), a party must file a motion for attorney's fees at least 10 days prior to expiration of the 30 days provided for in Fed.R.App.P. 4(a) for filing a notice of appeal). The March 21, 1989 order, however, was ambiguous as to the disposition of the Mobile Plan's counterclaim for payment of withdrawal liability and interest. The judgment entered with the order, moreover, did not mention the Mobile Plan's counterclaim. This action by the district court was not final and, therefore, did not begin S.D.Ala.R. 28's clock running.