923 F.2d 1461
 13 Employee Benefits Ca 1433
 Joseph P. CONNORS, Sr., Donald E. Pierce, Jr., William
Miller, William B. Jordan, and Paul R. Dean, as Trustees of
the United Mine Workers of America 1950 Pension Plan, and
1974 Pension Plan, Plaintiffs-Appellees,
v.
RYAN'S COAL COMPANY, INC., a corporation; Alan's Coal
Sales, a partnership; Simmons Equipment Co., Inc., a corp.;
Simmons Machinery, Inc., a corporation; Berry Mountain
Mining Co., Inc., a corp.; George M. Simmons, an
individual; and George Alan Simmons, an individual, Defendants,
Janice Simmons, an individual, Defendant-Appellant.
 No. 89-7046.
 United States Court of Appeals,
Eleventh Circuit.
 Feb. 6, 1991.
 
 William H. Mills, Gerald L. Miller, Redden, Mills & Clark, Birmingham, Ala., for defendant-appellant.
 Patrick K. Nakamura, Longshore, Nakamura & Quinn, Birmingham, Ala., and United Mine Workers of America Health and Retirement Funds, Margaret M. Topps, Kathleen M. Dowd, David W. Allen, Washington, D.C., for plaintiffs-appellees.
 Appeal from the United States District Court for the Northern District of Alabama.
 Before TJOFLAT, Chief Judge, CLARK, Circuit Judge and SMITH*, Senior Circuit Judge.
 EDWARD S. SMITH, Senior Circuit Judge:
 
 
 1
 Alan's Coal Sales (Alan's) ceased operations and defaulted on its payments to the United Mine Workers Pension Fund. After Alan's failed to take steps under the Multiemployer Pension Plan Amendments Act of 1980 (MPPAA)[1] to obtain arbitration, the pension fund trustees brought an action for enforcement under 29 U.S.C. Sec. 1451 in the United States District Court for the Northern District of Alabama. The court struck the defendants' timely jury demand and proceeded to find the entities under common control with Alan's jointly and severally liable for Alan's withdrawal liability. Appellant Janice Simmons first argues that the district court's decision to strike the jury demand on authority of the mandatory arbitration provisions of the MPPAA violated her Seventh Amendment rights. Appellant next asserts that the district court improperly held her to be a partner in a cattle farm operation which was a member of a controlled group with the signatory employer Alan's. We agree with the district court's disposition of the jury trial issue and hold that its findings on the partnership question are amply supported by the evidence. The judgment is affirmed.
 
 Statutory Framework
 
 2
 The MPPAA was enacted in 1980 as an amendment to the then existing Employee Retirement Income Security Act of 1974 (ERISA),[2] which Congress enacted to regulate employee benefit plans. Under ERISA, the Pension Benefit Guaranty Corporation (PBGC), a government corporation, protects covered employees by insuring their benefits against fund insolvency or premature termination. The PBGC's program receives no general revenue proceeds and is financed exclusively by premiums collected from pension funds.[3]
 
 
 3
 The original version of ERISA had imposed no withdrawal liability on a contributor to a multiemployer plan except when the entire plan terminated within five years of the employer's withdrawal, and even then the employer's liability was limited to 30% of the employer's net worth.[4] The PBGC reported to Congress that the premiums paid to it were insufficient to cover its expected future liabilities; ERISA's contingent liability provisions gave employers an incentive to withdraw from financially weak multiemployer plans to avoid liability if the plan terminated in the future.[5] In response to this threat to the continued viability of the PBGC Congress enacted the MPPAA in 1980.[6] The MPPAA sought to discourage voluntary withdrawals from multiemployer plans by imposing a mandatory liability on all withdrawing employers. The basic concept of the provision is that each employer, in addition to the contributions to the plan pursuant to collective bargaining agreements, owes a share of the unfunded vested liability of the plan to its beneficiaries.[7] The withdrawing employer must pay its share even if the plan does not terminate.
 
 
 4
 At the heart of the MPPAA's regime are provisions for informal, expeditious resolution of withdrawal liability disputes.[8] A withdrawal occurs when an employer ceases to have an obligation to contribute under a plan or ceases all operations covered under the plan.[9] Upon withdrawal the trustees of the multiemployer fund must promptly determine the amount of liability pursuant to a statutory formula,[10] formulate a payment schedule, and notify the employer of the resulting assessment and schedule.[11] Within 90 days of the notification the employer may request that the sponsor review its determination.[12] If either party is dissatisfied with the outcome of the review, the MPPAA mandates arbitration proceedings.[13] After arbitration, or if no arbitration proceeding has been initiated, either party may bring an action in federal district court "to enforce, vacate, or modify the arbitrator's award."[14] The employer is required to make interim payments to the fund until the dispute is resolved by the arbitrator or through judicial review.[15] Any failure to make such payments as outlined in the Act results in default; in the event of a default the plan sponsor may require immediate payment of the outstanding amount of an employer's withdrawal liability.[16]
 
 Background
 
 5
 George Simmons and members of his family owned interests in several different enterprises which mined coal and serviced the coal mining industry. One of the mining concerns, Ryan's Coal Company (Ryan's), was a signatory to the National Bituminous Coal Wage Agreements of 1979, 1981 and 1984. Under the agreements Ryan's was a participating member in the United Mine Workers of America (UMW) Pension Plans and was obligated to contribute to the plans on behalf of its employees. In March of 1985 Ryan's ceased covered operations under the plans and thereby became subject to withdrawal liability under the provisions of the MPPAA.
 
 
 6
 The trustees of the 1950 and 1974 UMW pension funds assessed withdrawal liability against Ryan's by a notice and demand letter to George Simmons[17] dated September 30, 1985. The letter set forth a payment schedule, notified Simmons of his rights to arbitration, and outlined the consequences of default. The letter also discussed, in a section entitled "Persons Liable", the potential joint and several liability of all businesses under common control with Ryan's. Simmons was advised to consult an attorney for advice on the ERISA controlled group rules. Unfortunately, Ryan's and the other entities allegedly controlled by Simmons failed to request review or initiate arbitration as provided by the MPPAA. Ryan's also failed to comply with the payment schedule, so the company was technically in "default" as that term is defined in the MPPAA; consequently, under the statute, the entire outstanding withdrawal liability was due and payable at the option of the trustees.
 
 
 7
 The trustees then filed an action under 29 U.S.C. Secs. 1132(a)(3), 1451(a)(1) and 1451(b) of ERISA in U.S. District Court against Alan's Coal Sales[18] and other Simmons family enterprises for collection of the unpaid withdrawal liability. The trustees sought liability against George Simmons and Alan Simmons on the basis of the alter ego finding affirmed in Combs v. Ryan's Coal Co.[19] and their various interests in the operation of Alan's. Other corporate defendants, Simmons Equipment Co., Simmons Machinery, and Berry Mountain Mining Co., were alleged to be liable for withdrawal liability as members of a group of trades or businesses under common control of the signatory employer.[20] The trustees asserted that the wife of George Simmons, Janice Simmons, was liable for the delinquent withdrawal liability payments based on her partnership interest in a cattle farm jointly owned with her husband. The farm operation was alleged to be an additional member of the group of trades or businesses under common control with the other Simmons family enterprises.
 
 
 8
 The district court found all the corporate defendants and the cattle farm to be part of a controlled group with the signatory employer Alan's. A judgment was entered finding all the individual and corporate defendants jointly and severally liable to the 1950 and 1974 pension plans for Alan's outstanding withdrawal liability obligation. Defendant Janice Simmons takes issue with several of the district court's legal conclusions with respect to her interests in the cattle farm operation and appeals from the judgment entered against her.
 
 Issues
 
 9
 I. In view of the MPPAA's mandatory arbitration provisions the district court struck appellant's timely jury demand in the pre-trial order. Did the court's action violate appellant's rights to a jury trial under the Seventh Amendment?
 
 
 10
 II. As noted above, the district court held that the Simmons cattle farm was a member of the control group with signatory employer Alan's Coal Sales. Appellant does not take issue with this finding, but instead contends that the court erred in finding her individually liable to the trustees based on her interest in the cattle farm operation.
 
 
 11
 A. Initially the court found appellant liable to the trustees based on her interest as a partner or joint venturer in the cattle farm operation. Is the court's determination of the existence of a partnership supported by the evidence?
 
 
 12
 B. As an alternative ground of liability the court found appellant to be a co-owner of the trade or business which owned the farm land and leased it to the cattle farming operation. Did the court err by finding that appellant's activities constituted a trade or business under the ERISA controlled group provisions?
 
 I.
 
 13
 The MPPAA requires entities challenging assessments of withdrawal liability to do so in an arbitration proceeding. Although district court review of the arbitration decision is available under the provisions of the Act, a de novo trial with a jury is not. In the present case the defendants (including appellant Janice Simmons) made a timely demand for a trial by jury, but the demand was stricken sua sponte by the district judge in the pre-trial order. According to appellant, the district court's decision to strike the demand, on authority of the mandatory arbitration provisions of the MPPAA, violated her right to a jury trial under the Seventh Amendment to the United States Constitution.[21]
 
 
 14
 Under the MPPAA Congress established a cause of action and then set up a detailed procedure which included the use of a specialized tribunal to perform the fact-finding function. It is well established that the Seventh Amendment applies only to "suits at common law"; therefore, when Congress creates a new cause of action and remedies unknown to the common law, it may vest fact-finding in a tribunal other than a jury, free from the strictures of the Seventh Amendment.[22] Since the trustees' cause of action under the enforcement provisions of the MPPAA never existed at common law, we do not believe that the arbitration provisions of the MPPAA unconstitutionally deprived appellant of her right to a jury trial.[23]
 
 
 15
 Appellant relies principally on the Seventh Circuit's decision Bugher v. Feightner[24], in which the trustees of a union pension plan brought an action under the civil enforcement provision of ERISA, 29 U.S.C. Sec. 1132, and the Labor-Management Relations Act, 29 U.S.C. Sec. 185(a), to recover delinquent contributions from an employer. The trustees' complaint sought monetary damages under the equitable theories of accounting and specific performance. The court construed the action as a mere contractual dispute between private parties and held that the plaintiff trustees had a legal remedy for breach of contract under 29 U.S.C. Sec. 185(a).[25] Nowhere does that opinion hold that a jury trial is available under Sec. 1132 of ERISA.
 
 
 16
 Since Bugher is not specifically applicable to the case at bar, appellant urges that we adopt its rationale and consider the present action under 29 U.S.C. Sec. 1451 as a private contractual dispute between two parties. If it were so, appellants position on this issue would be much stronger, for under Atlas Roofing Congress may not deny trials by jury in actions at law where "private rights" are litigated.[26] However, liability under the MPPAA is not a contractually or privately created burden, but it is imposed by law and its benefits eventually inure to all beneficiaries of multiemployer pension plans.[27] In other words, more is involved here than a private dispute between a corporation and the pension fund trustees. Ultimately, liability for unfunded vested rights to benefits will fall on the PBGC, a public body representing the public interest in the continued solvency of the pension fund system.[28] The provisions of the MPPAA constitute a pervasive scheme for the regulation of multi-employer pension plans; therefore, a cause of action arising under the enforcement provisions of Sec. 1451, seemingly private, is "so closely integrated into a public regulatory scheme" that non-judicial resolution is nonetheless appropriate.[29] The statutory right asserted by the trustees here is "closely intertwined" with a valid federal regulatory program. In contrast to appellant's position, this case involves "public rights".[30] Appellant's rights to a jury trial under the Seventh Amendment have not been abridged by the mandatory arbitration provisions of the MPPAA.[31]
 
 II.
 
 17
 The trial in this case was based upon a stipulated record consisting of: (1) the agreed upon facts in the pre-trial order; (2) the deposition of George Simmons, with exhibits; and (3) certain affidavits concerning the administrative history of the case and the amount due the trustees. The affidavits do not refer to Janice Simmons, so the only testimonial evidence before the trial court relating to appellant's role in the cattle farming operation is the deposition of George Simmons. Throughout her brief appellant seems to imply that this limited record makes the court's findings of fact in some way suspect. The testimonial evidence concerning appellant's participation in the cattle farm operation is indeed limited, but this fact standing alone does not entitle a reviewing court to independently review factual disputes. "If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the trier of fact, it would have weighed the evidence differently."[32] "When there are two different views of the evidence, the fact-finder's choice between them cannot be clearly erroneous."[33] The clearly erroneous standard applies even when the district court's findings rest on documentary evidence or on inferences from other facts.[34]
 
 A.
 
 18
 It is well settled that the MPPAA contemplates recovery of withdrawal liability from partners and partnerships under common control with defaulting signatory employers.[35] The question for determination at present is whether appellant was indeed a partner in the cattle farm operation. While we may look to state law for guidance, the question whether a business relationship qualifies as a partnership is ultimately one of federal law.[36] "If, upon consideration of all the facts, it is found that the partners joined together in good faith to conduct a business, having agreed that the services or capital to be contributed by each is of such value to the partnership that the contributor should participate in the distribution of the profits, that is sufficient."[37] The true focus of the inquiry must be on whether the alleged partners really and truly intended to join together in the present conduct of the enterprise.[38] Their intention in this respect is a question of fact,[39] and may be determined with reference to an express agreement or from the circumstances surrounding the purported partnership arrangement.[40]
 
 
 19
 In the present case the cattle farm was located on land owned 40% by George Simmons and 60% by George and Janice Simmons jointly. George Simmons apparently owned all the equipment and personally supervised the day to day operation of the business. Under this arrangement appellant argued in the district court that she was not in the business of cattle farming, and merely characterized her interest in the operation as no more than a landlord of a portion of the farm land.
 
 
 20
 While no actual partnership agreement was executed, the court noted several additional facts which shed light on the parties' intentions. First, the property taxes on the farm land (including appellant's portion) were paid by the cattle farming operation and the Simmons took the payment as a deduction on Schedule F[41] of their 1984 joint federal tax return. Second, the cattle farming operation made the mortgage payments on the farm land; the interest portion of these payments was later deducted as an expense of running the cattle farm. Finally, the court cited the 1984 return as evidence that the Simmons shared in the profits and losses of the cattle farm operation.
 
 
 21
 After considering the record as a whole, the district court found that the evidence demonstrated "... a nexus between the cattle farm and [appellant's] ownership of the land that would lead a reasonable person to believe that for [appellant] to own farmland, she was necessarily involved in her husband's cattle farming business." The court continued: "Clearly, [appellant's] pre-litigation perception and intent was that her ownership of farm land made her a partner or joint venturer in the cattle farming operation." After a careful review of the record, we see nothing to indicate that the district court's factual conclusions were clearly erroneous and consider the court's legal conclusion that appellant was a partner in the cattle farming operation amply supported by the evidence.
 
 
 22
 We note that the conclusion of the district court is additionally supported by George Simmons' practice of including family members in business operations. For instance, each of Simmons' sons owned a ten percent interest in Ryan's. One son, Alan, is the attorney for Simmons Equipment Company. Moreover, appellant, Janice Simmons, is a corporate officer and the sole shareholder of Simmons Equipment Company, another business under common control with Ryan's.[42]
 
 
 23
 We recognize that co-ownership of property without more does not create a partnership. However, the co-ownership of business property along with the sharing of business profits and losses and George Simmons' well documented practice of including family members in his business operations, indicate that the co-owners of the cattle farm carried on the requisite "degree of business activity" to be considered partners under federal and state law.[43]
 
 
 24
 The dissenting opinion points out that an opposite conclusion might be plausible. However, when there are two different views of the evidence, the decision of the district court who is sitting as the trier of fact cannot be clearly erroneous.[44]
 
 B.
 
 25
 The district court properly found appellant liable to the trustees based on her partnership interest in the cattle farming operation. Consequently, the district court's alternative theory of liability need not be considered.
 
 Conclusion
 
 26
 Congress enacted the controlled group provision to "prevent businesses from shirking their ERISA obligations by fractionalizing operations into many separate entities".[45] The various entities operated by the Simmons family failed to take the steps required under the MPPAA to obtain arbitration, and as a consequence lost the opportunity to obtain review of the amount due and risked default. Appellant Janice Simmons' Seventh Amendment rights have not been abridged by the MPPAA's mandatory arbitration procedures, which form an integral part of a public regulatory scheme enacted to insure the solvency of the PBGC. The authority to initially adjudicate claims derived from such Congressionally created statutory public rights may unquestionably be placed in a non-judicial forum. Appellant apparently hoped that she would not subsequently be deemed liable with Alan's under a controlled group theory, but the facts betray her attempts to characterize her interests as separate and distinct from those of the cattle farm controlled by Alan's. The partners in an enterprise are responsible for whatever legal consequences attach to their choice of business organization; therefore, appellant is personally liable for Alan's withdrawal liability obligation under 29 U.S.C. Secs. 1301(b)(1) and 1381. The result we reach here is neither onerous, nor inconsistent with the objectives of ERISA and the MPPAA--maximum protection of pension plan participants.[46] The judgment of the district court is AFFIRMED.
 
 CLARK, Circuit Judge, dissenting:
 
 27
 The trustees of the 1950 and 1974 Pension Plans brought this action against Janice Simmons in her personal capacity asserting that she is jointly and severally liable with several other defendants for Alan's Coal Sales' withdrawal liability under the Multiemployer Pension Plan Amendments Act of 1980 ("MPPAA"). The district court's finding that Ms. Simmons is personally liable rests on the theory that she and her husband were partners in a cattle farming business, or alternatively, that she and her husband engaged in a trade or business of leasing land. Because I find the evidence insufficient to establish a prima facie case 1) that Janice Simmons and her husband intended to form a partnership in the cattle farming business, or 2) that Janice Simmons and her husband engaged in a trade or business of leasing land, I respectfully dissent.
 
 
 28
 Under the MPPAA, all trades and businesses under common control are treated as a single employer. 29 U.S.C. Sec. 1301(b)(1) (1980). Therefore, when an employer incurs withdrawal liability, all trades or businesses under common control with that employer become jointly and severally liable with the employer for the withdrawal liability. Teamsters Pension Trust Fund v. H.F. Johnson, 830 F.2d 1009, 1013 (9th Cir.1987). To prove that Ms. Simmons is personally liable for Alan's Coal Sales' withdrawal liability, the trustees must prove that she is associated with a trade or business under common control with Alan's Coal Sales and that the association results in her being personally liable for that business enterprise's debts.
 
 A. Evidence of Partnership
 
 29
 In support of a finding of liability on the part of Ms. Simmons, the trustees argue, and the district court found, that she was a partner with her husband in a cattle farming business that was under common control with Alan's Coal Sales within the meaning of 29 U.S.C. Sec. 1301(b)(1). Section 1301(b)(1) provides that the term "common control" should be interpreted to be "consistent and coextensive" with the definition for that term set forth by the Secretary of the Treasury under section 414(c) of the Internal Revenue Code. 29 U.S.C. Sec. 1301(b)(1) (1980). Thus, for the purposes of establishing withdrawal liability, a business enterprise may be found to be under common control with the withdrawing employer if it is a member of a "parent-subsidiary group," a "brother-sister group," or a "combined group" of businesses under common control with the withdrawing employer. See 26 C.F.R. Sec. 1.414(c)-2 (1990). Although it is not clear from the district court's opinion, the court must have found that the cattle farming operation was a member of a "brother-sister group," as there is no evidence that anyone other than George Simmons and Janice Simmons had any ownership interest whatsoever in the cattle farming operation.
 
 
 30
 To support a finding that the cattle farming operation was a member of a "brother-sister group" of business under common control along with Alan's Coal Sales, the evidence must show that 1) the same five or fewer persons have a "controlling interest" in each member of the group, and 2) taking into account the ownership of each such person only to the extent such ownership is identical with respect to each member of the group, such persons are in "effective control" of each organization. 26 C.F.R. Sec. 1.414(c)-2(c) (1990). For partnerships, "controlling interest" and "effective control" are defined in terms of ownership of certain percentages of the profits interest or capital interest of the partnership. 26 C.F.R. Sec. 1.414(c)-2 (1990). With respect to the alleged cattle farming partnership between George and Janice Simmons, the record reveals no evidence regarding their ownership interests in the "partnership's" profits or capital. The district court apparently concluded from George Simmons's deposition testimony that he owns 40% of the land individually and 60% jointly with his wife; that he buys all the necessary equipment and supplies for the operation; and that his ownership interest in the "partnership's" capital must meet the definitions of "controlling interest" and "effective control." Although the parties do not take issue with the district court's conclusion that the alleged partnership was under "common control" with Alan's Coal Sales, I find the record insufficient to support such a conclusion.
 
 
 31
 Nevertheless, even assuming that the alleged partnership between George and Janice Simmons could be found to be under "common control" with Alan's Coal Sales, the entirety of the evidence presented to the district court fails to establish a prima facie case that such a partnership existed. The majority finds that the question of whether such a partnership existed is ultimately a question of federal law, and that the focus of the inquiry must be on the intent of the alleged partners. Based on the general proposition that the question of "intent" is a question of fact, the majority reviews the district court's determination that Ms. Simmons was her husband's business partner under the clearly erroneous standard of review. While I cannot agree that the question of the existence of a partnership is purely a question of fact, rather than a mixed question of law and fact, even under the majority's standards the district court's ruling cannot be upheld.
 
 
 32
 As the plaintiffs in this action, the trustees of the pension funds bear the burden of proof as to Ms. Simmons's liability. Thus, the trustees bear the burden of proving that a partnership existed between Ms. Simmons and her husband. To meet that burden, the evidence must at the very least establish a prima facie showing of the existence of a partnership. A district court's finding of fact is clearly erroneous if the evidence is insufficient to support a prima facie case.
 
 
 33
 The majority cites the following evidence from the record to support its conclusion that the district court was not clearly erroneous in finding that Ms. Simmons was a partner with her husband in the cattle farming operation. The cattle farm was located on land owned 40% by Mr. Simmons individually and 60% by Janice and George jointly. Mr. Simmons "apparently" owned all the equipment and supervised the day-to-day operations. The cattle farming operation paid the property taxes on the land and made the mortgage payments, and the appropriate deductions were shown as expenses of the operation on Schedule F of the couple's joint tax return. The joint tax return also indicated that the couple shared in the profits and losses of the operation.
 
 
 34
 Although the majority appears to acknowledge the well-established proposition that mere co-ownership of property does not create a partnership, a careful review of the evidence shows that the finding that Ms. Simmons was a partner rests entirely on the fact that she has a joint ownership interest with her husband in a portion of the property. Absent the evidence of her ownership interest in the land, the above-cited evidence gives no indication that a business partnership exists between the Simmons. The fact that a husband and wife file a joint tax return, or that income from a farm's operations is reported on that joint return and thus appears to accrue to their joint benefit is of no probative value with respect to the existence of a partnership. See Zeeman v. United States, 395 F.2d 861, 864 (2d Cir.1968) (Filing of joint tax return does not amount to merger of spouses into a permanent, single economic unit.) When a farm is run as a sole proprietorship, farm income is appropriately reported by attaching Schedule F to the proprietor's tax return. While the fact that Mr. Simmons reported the farm's income as though he was its sole proprietor does not conclusively establish that the farm was not run as a partnership, it also does not establish that the farm was run as a partnership.
 
 
 35
 Thus, the district court's and majority's conclusions that Ms. Simmons was her husband's business partner rest entirely on the fact that she had an ownership interest in some of the land used by the farm operation and that the farm operation paid the mortgage and the property taxes on the land. A review of federal and state law reveals that such evidence is clearly insufficient to establish the existence of a partnership between a husband and wife.
 
 
 36
 Although the existence of a partnership in this case is ultimately a question of federal law, Johnson, 830 F.2d at 1014, reference to state law is necessary, as the federal common law of partnership so far developed in this area is sparse at best. The best approach is to apply, consistent with the purposes of the MPPAA, the common law of partnership as it has been developed in the various states. As of 1988, all states except Louisiana have adopted the Uniform Partnership Act (the "UPA"). 1 Z. Cavitch, BUSINESS ORGANIZATIONS WITH TAX PLANNING Sec. 11.01 n. 7 (1990). The UPA defines a partnership as "an association of two or more persons to carry on as co-owners a business for profit." Uniform Partnership Act Sec. 6. In general, a partnership arises only from an express or implied agreement among the parties and is never established by implication or operation of law. Adderhold v. Adderhold, 426 So.2d 457 (Ala.Civ.App.1983). Under the UPA, one of the rules for determining the existence of a partnership is that "[j]oint tenancy, tenancy in common, tenancy by the entireties, joint property, common property or part ownership does not of itself establish a partnership, whether such co-owners do or do not share any profits made by the use of the property." Uniform Partnership Act Sec. 7(2). Therefore, the fact that Ms. Simmons "shared" in the profits of the farming operation as a result of the payment of her pro rata portion of the property taxes and mortgage is not sufficient to establish the existence of a partnership. Furthermore, the record is completely devoid of any evidence on the important issue of whether Ms. Simmons enjoyed a right to manage and control the business. Adderhold, 426 So.2d at 459 (holding that while co-ownership of property is not generally held a condition of partnership, a "community of interest which includes the right to manage and control the business" is).
 
 
 37
 The majority's holding that the evidence supports a finding that a partnership existed between George and Janice Simmons is inconsistent with the general trend of federal and state partnership law with respect to the existence of business partnerships between husbands and wives. While the existence of a partnership may be established from "the circumstances surrounding the purported partnership arrangement," Majority Opn. at 1467, "acts and circumstances between spouses may not have the same significance ... as the same acts and circumstances between strangers might have." Sunkyong International v. Anderson Land & Livestock Co., 828 F.2d 1245, 1249 (8th Cir.1987) (quoting Fish v. Fish, 307 S.W.2d 46, 52 (Mo.Ct.App.1957)). For example, the Supreme Court of North Dakota found the following facts insufficient to support a claim that a partnership existed between a husband and wife. The husband and wife jointly purchased farm land, on which the husband raised cattle. Proceeds from the farm operations were used for family expenses and to pay the mortgage on the land. The wife did not participate on a daily basis in the purchase or sale of the cattle, although she did occasionally assist in the operation by milking cows, etc. The court found that this evidence presented "no credible evidence to support a claim of partnership." Schlichenmayer v. Luithle, 221 N.W.2d 77, 82 (N.D.1974) (holding that under state statutory law, "joint tenants are not, merely because of joint ownership, partners"). See also Stern v. Wisconsin Dept. of Revenue, 63 Wis.2d 506, 217 N.W.2d 326, 329 (Wis.1974) (holding in the case of a husband and wife interior decorating business that "mere community of interest in property, such as exists between ... joint tenants of real or personal property, does not make such owners partners or raise a presumption that a partnership exists, and this is so even though they cooperate in making improvements on their property and in realizing and sharing the profits or the losses and expenses arising therefrom"); Farm Bureau Service Co. of Hardin County v. Bavender, 217 N.W.2d 560, 563 (Iowa 1974) (holding in a case of husband and wife joint tenants of farmland similar to the present case that the "evidence in this case is totally lacking with regard to any voluntary agreement between the defendants to engage in a joint venture in the operation of their farming enterprise. Instead, the evidence demonstrates a typical joint ownership of property and the pooling of assets for common advantage between a husband and wife.").[1]
 
 
 38
 B. Evidence of Trade or Business of Leasing Land
 
 
 39
 The district court held in the alternative that if Janice Simmons was not a partner in her husband's cattle farming operation, then she was clearly a co-owner of the "trade or business" which owned the land and leased it to Mr. Simmons as the sole proprietor of the cattle farming operation. The court reasoned that Ms. Simmons was therefore a partner or joint venturer with her husband in this land leasing business, which, apparently by virtue of Mr. Simmons's involvement, was under common control with Alan's Coal Sales.[2] Assuming for the sake of argument that this alleged partnership could be found to be under common control with Alan's Coal Sales, I find the evidence insufficient to show that by allowing their jointly owned property to be used by Mr. Simmons in his cattle farming business, the Simmons were engaged in a "trade or business" of leasing land.
 
 
 40
 Neither ERISA nor the MPPAA define the term "trade or business," although section 1301(b) refers to the regulations promulgated under section 414(c) of the Internal Revenue Code as providing the proper guidelines. 29 U.S.C. Sec. 1301(b) (1988). The District Court of New Jersey, in a thorough and thoughtful opinion, reasoned that because section 414(c) and its regulations also give no definition of "trade or business," the courts should interpret the meaning of "trade or business" in light of the purposes of ERISA. United Food & Commercial Workers Union v. Progressive Supermarkets, 644 F.Supp. 633, 637-39 (D.N.J.1986); accord Pension Benefit Guaranty Corp. v. Center City Motors, 609 F.Supp. 409 (S.D.Cal.1984). With respect to the imposition of withdrawal liability on all employers under common control with the withdrawing employer under the MPPAA, Congress "clearly intended to prevent a business from limiting its responsibilities under ERISA by the fractionalization of its business operations." Center City Motors, 609 F.Supp. at 412; H.R.Rep. No. 807, 93d Cong., 2d Sess., reprinted in 1974 U.S.Code Cong. & Admin.News 4639, 4716 ("The committee ... intends to make it clear that the coverage and antidiscrimination provision cannot be avoided by operating through separate corporations instead of separate branches of one corporation."). This forced sharing of withdrawal liability among commonly controlled entities thus furthers the central purpose of ERISA, the prevention of "the great personal tragedy suffered by employees when pension plans are terminated." Nachman Corp. v. Pension Benefit Guaranty Corp., 446 U.S. 359, 374, 100 S.Ct. 1723, 1733, 64 L.Ed.2d 354 (1980).
 
 
 41
 Congress' casting of this wide net of liability strongly indicates that courts should liberally construe the provisions of ERISA and MPPAA to provide maximum protection to employees covered under pension plans. Center City Motors, 609 F.Supp. at 411. Nevertheless, Congress did set limits by confining liability to those "trades or businesses" under common control with the withdrawing employer. Thus, for example, a commonly controlled corporation's shareholders are not personally responsible for the withdrawal liability. DeBreceni v. Graf Brothers Leasing, Inc., 828 F.2d 877 (1st Cir.1987), cert. denied, 484 U.S. 1064, 108 S.Ct. 1024, 98 L.Ed.2d 988 (1988); Connors v. P & M Coal Co., 801 F.2d 1373 (D.C.Cir.1986). Even in light of Congress' desire to provide maximum protection to employees, I cannot agree with the district court that under the circumstances as they appear in the record, the Simmons were engaged in a "trade or business" of leasing land. The record shows only that they jointly own a portion of the land that Mr. Simmons uses for cattle farming. Although the farming operation pays the property taxes and mortgage on the land, the evidence does not indicate the existence of either a written or oral lease agreement. Under these circumstances, the record reveals only joint ownership of land by a husband and wife that one spouse uses for farming, not a "trade or business" of leasing land employed by the couple at least partially for the purpose of protecting the land from any liabilities incurred by the farming operation.
 
 
 42
 Because this case involves a sole proprietor using land that he and his wife own for the benefit of the sole proprietorship, it involves a "leasing" of land that is qualitatively different from other leasing operations that have been held to be "trades or businesses" within the meaning of the MPPAA. For example, in Board of Trustees of the Western Conference of Teamsters Pension Trust Fund v. Lafrenz, 837 F.2d 892 (9th Cir.1988), a husband and wife together owned 96% of the stock of a corporation. They also owned two dump trucks, which they leased to the corporation admittedly for profit. The Ninth Circuit, while acknowledging that not every passive investment is necessarily a trade or business, held that the dump truck leasing operation was a trade or business within the meaning of Sec. 1301(b). Similarly, in Central States, Southeast and Southwest Areas Pension Fund v. Bay, 684 F.Supp. 483 (E.D.Mich.1988), a husband and wife purchased commercial real estate that they leased to related corporations and from which they reported rental income. The court concluded that this leasing operation qualified as a trade or business under section 1301(b).
 
 
 43
 In contrast, the present case involves a sole proprietor using land that he and his wife jointly own. He would gain no protection for the land by leasing it to his sole proprietorship, as any assets he owns are subject to liabilities incurred by his business. While Ms. Simmons may legally have a right to demand some payment for her husband's business's use of her portion of the land, nothing in the law requires that she do so, or requires that a lease be implied where there is no evidence of a formal lease arrangement.
 
 
 44
 In conclusion, I find the evidence that Ms. Simmons jointly owned farmland with her husband and that payment of the property taxes and mortgage on that land was deducted as a business expense on Schedule F of the couple's joint tax return insufficient to establish either that Ms. Simmons intended to join with her husband in "an association ... to carry on as co-owners a business for profit" or that Ms. Simmons was engaged in a trade or business of leasing land to her husband's sole proprietorship cattle farm. I therefore dissent from the majority's imposition of personal liability on Ms. Simmons for Alan's Coal Sales withdrawal liability.
 
 
 
 *
 Honorable Edward S. Smith, Senior U.S. Circuit Judge for the Federal Circuit, sitting by designation
 
 
 [1]
 29 U.S.C. Secs. 1381-1453 (1988)
 
 
 [2]
 29 U.S.C. Secs. 1001-1461 (1988)
 
 
 [3]
 29 U.S.C. Sec. 1302 (1988)
 
 
 [4]
 Republic Indus., Inc. v. Teamsters Joint Council of Va. Pension Fund, 718 F.2d 628, 632 (4th Cir.1983)
 
 
 [5]
 Keith Fulton & Sons, Inc. v. New England Teamsters and Trucking Indus. Pension Fund, 762 F.2d 1124, 1127 (1st Cir.1984)
 
 
 [6]
 Carriers Container Council v. Mobile Steamship Assoc., Inc., 896 F.2d 1330, 1342 (11th Cir.1990)
 
 
 [7]
 Republic Indus., 718 F.2d at 632
 
 
 [8]
 I.A.M. Nat'l Pension Fund v. Clinton Engines Corp., 825 F.2d 415, 416 (D.C.Cir.1987)
 
 
 [9]
 29 U.S.C. Sec. 1383(a) (1988)
 
 
 [10]
 29 U.S.C. Sec. 1393(c) (1988)
 
 
 [11]
 29 U.S.C. Secs. 1382, 1399(b)(1) (1988)
 
 
 [12]
 29 U.S.C. Sec. 1399(b)(2)(A) (1988)
 
 
 [13]
 29 U.S.C. Sec. 1401(a)(1) (1988) reads in pertinent part as follows: "Any dispute between an employer and the plan sponsor ... shall be resolved through arbitration." (emphasis added)
 
 
 [14]
 29 U.S.C. Secs. 1401(b)(2), 1451 (1988)
 
 
 [15]
 Carriers Container Council, 896 F.2d at 1345-46; 29 U.S.C. Sec. 1401(d) (1988)
 
 
 [16]
 29 U.S.C. Sec. 1399(c)(5) (1988)
 
 
 [17]
 George Simmons was president and chief executive officer of Ryan's. He owned 80% of Ryan's stock at the time the company ceased covered operations under the pension plan
 
 
 [18]
 In Combs v. Ryan's Coal Co., Inc., 785 F.2d 970, 974 (11th Cir.), cert. denied, 479 U.S. 853, 107 S.Ct. 187, 93 L.Ed.2d 120 (1986), this court affirmed a district court finding that Alan's Coal Sales was the successor of Ryan's and that George Simmons was the alter ego thereof
 
 
 [19]
 785 F.2d at 974
 
 
 [20]
 All members of a group of trades or businesses under common control of the signatory employer are responsible for withdrawal liability assessed by a plan. 29 U.S.C. Sec. 1301(b)(1) (1988); IUE AFL-CIO Pension Fund v. Barker & Williamson, Inc., 788 F.2d 118 (3rd Cir.1986)
 
 
 [21]
 The Seventh Amendment provides: "In suits at common law, where the value in controversy shall exceed twenty dollars, the right of trial by jury shall be preserved, and no fact tried by a jury, shall be otherwise re-examined in any Court of the United States, than according to the rules of the common law."
 
 
 [22]
 Granfinanciera, S.A. v. Nordberg, 492 U.S. 33, 109 S.Ct. 2782, 2795, 106 L.Ed.2d 26 (1989), citing Atlas Roofing v. Occupational Safety and Health Review Comm'n, 430 U.S. 442, 455-58, 97 S.Ct. 1261, 1269-71, 51 L.Ed.2d 464 (1977)
 
 
 [23]
 Keith Fulton, 762 F.2d at 1132; Textile Workers Pension Fund v. Standard Dye & Finishing Co., 725 F.2d 843, 855 (2nd Cir.1984); Peick v. Pension Benefit Guar. Corp., 724 F.2d 1247, 1277 (7th Cir.1983); Republic Indus., 718 F.2d at 642
 
 
 [24]
 722 F.2d 1356 (7th Cir.1983)
 
 
 [25]
 722 F.2d at 1360
 
 
 [26]
 Granfinanciera, 109 S.Ct. at 2795, citing Atlas Roofing, 430 U.S. at 458, 97 S.Ct. at 1270
 
 
 [27]
 Peick, 724 F.2d at 1277
 
 
 [28]
 Republic Indus., 718 F.2d at 642
 
 
 [29]
 See Granfinanciera, 109 S.Ct. at 2797
 
 
 [30]
 Granfinanciera, 109 S.Ct. at 2797. See also Keith Fulton, 762 F.2d at 1133; Peick, 724 F.2d at 1277
 
 
 [31]
 As noted in Keith Fulton, 762 F.2d at 1132, we do not hold here that the enforcement of withdrawal liability under the MPPAA is a legal claim. Trust administration proceedings have traditionally been considered equitable in nature
 
 
 [32]
 Anderson v. Bessemer City, 470 U.S. 564, 573-74, 105 S.Ct. 1504, 1511-12, 84 L.Ed.2d 518 (1985)
 
 
 [33]
 Id. at 574, 105 S.Ct. at 1512
 
 
 [34]
 Id
 
 
 [35]
 See Teamsters Pension Trust Fund v. H.F. Johnson, 830 F.2d 1009, 1015 (9th Cir.1987); 29 U.S.C. Sec. 1301(b)(1)
 
 
 [36]
 Johnson, 830 F.2d at 1014
 
 
 [37]
 Commissioner v. Culbertson, 337 U.S. 733, 744-45, 69 S.Ct. 1210, 1215-16, 93 L.Ed. 1659 (1949). Since the farm was located in St. Clair County, Alabama, the law of Alabama is also instructive: "[T]he surrounding circumstances as well as any express agreement between the parties may evidence the intention of the parties to establish ... a partnership relationship." McCrary v. Butler, 540 So.2d 736, 739 (Ala.1989). Relevant indicia of a partnership include: intent and agreement to be partners, sharing the profits and losses, and sharing management and community of interest. Adderhold v. Adderhold, 426 So.2d 457, 460 (Ala.Civ.App.1983); Ala.Code Sec. 10-8-20 (1975)
 
 
 [38]
 Commissioner v. Culbertson, 337 U.S. at 742, 69 S.Ct. at 1214
 
 
 [39]
 Id. at 743, 69 S.Ct. at 1215
 
 
 [40]
 Meehan v. Valentine, 145 U.S. 611, 623, 12 S.Ct. 972, 974, 36 L.Ed. 835 (1891)
 
 
 [41]
 Schedule F sets forth farm income and expenses
 
 
 [42]
 The deposition testimony of George Simmons indicates that "sometime in 1986" he sold 100% of the stock in Simmons Equipment Co. to Janice Simmons. In addition, Janice Simmons is presently employed as the corporate secretary. See also Combs v. Ryan's Coal Co., 785 F.2d at 973-75
 
 
 [43]
 Madison Gas & Elec. Co. v. Commissioner, 633 F.2d 512, 514-15 (7th Cir.1980)
 
 
 [44]
 Anderson v. Bessemer City, 470 U.S. at 574, 105 S.Ct. at 1512
 
 
 [45]
 Teamsters Pension Trust Fund v. Allyn Transport Co., 832 F.2d 502, 507 (9th Cir.1987)
 
 
 [46]
 Barker & Williamson, 788 F.2d at 129
 
 
 [1]
 Accord G.R. Little Agency, Inc. v. Jennings, 88 N.C.App. 107, 362 S.E.2d 807 (1987); Skaar v. Wisconsin Dept. of Revenue, 61 Wis.2d 93, 211 N.W.2d 642 (1973); Cooper v. Spencer, 218 Va. 541, 238 S.E.2d 805 (1977); Harvey v. Palmer, 179 Kan. 472, 296 P.2d 1053 (1956); Herbert v. Herbert, 272 S.W.2d 705 (Mo.Ct.App.1954). For decisions by federal courts compare Breashears v. Mathews, 440 F.Supp. 1230 (W.D.Ark.1977) and Matter of Ward, 6 B.R. 93 (Bankr.M.D.Fla.1980) with Sunkyong International v. Anderson Land & Livestock Co., 828 F.2d 1245 (8th Cir.1987); In re Schroeder, 62 B.R. 604 (Bankr.D.Kan.1986); and In re Lapp, 66 B.R. 67 (Bankr.D.Colo.1986)
 
 
 [2]
 Here again I see no evidence in the record that clearly defines the capital or profits interests of George and Janice in this alleged land leasing partnership. Therefore, the record is insufficient to establish that this "land leasing business" is under common control with Alan's coal sales